**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| Voters Organized for Trusted Election Results in Georgia, *et al.*, *Plaintiffs*, | ) ) ) | |
| v. | ) ) | **Case No. 4:25-cv-00316-RSB-CLR** |
| Election Assistance Commission, *et al.*, *Defendants.* | ) ) | |

---

**Plaintiffs' Corrected Emergency Motion and Memorandum for Interim and Merits Relief**

---

Plaintiffs Voters Organized for Trusted Election Results in Georgia ("VoterGA"), DeKalb County Republican Party, Inc. ("DeKalb GOP"), Chatham County Republican Party, Inc. ("Chatham GOP"), Garland Favorito, and Richard J. Armstrong respectfully move the Court for urgent interim relief under 5 U.S.C. § 705 and—if the Court consolidates the merits and interim relief pursuant to Rule 65(a)(2)—merits relief under 5 U.S.C. § 706 against the certification of the Dominion Voting Systems ("DVS") Democracy Suite 5.5-A by defendants Election Assistance Commission, its Commissioners, and its Executive Director. Defendants' actions violated the Administrative Procedure Act, 5 U.S.C. §§ 551-706, procedurally and violated the Help America Vote Act of 2002, 52 U.S.C. §§ 20901-21145 ("HAVA") substantively. Plaintiffs' petition to EAC demonstrates DVS Democracy Suite 5.5-A's glaring cybersecurity flaws, and EAC's cavalier and dilatory response demonstrates the need for urgent judicial action. Given the importance of election integrity to our nation's democratic republic, Plaintiffs ask this Court to set an expeditious hearing on this motion for interim relief and to advance consideration of the merits to that hearing. *See* FED. R. CIV. P. 65(a)(1)-(2). Plaintiffs request relief based on the accompanying memorandum of law, the administrative record ("AR") record before the EAC (Ex. 1), declarations form DeKalb GOP's chair, Favorito, and Armstrong (Ex. 2, 3, and 4, respectively), the Complaint, and the proposed procedural order to advance the Court's consideration of the merits under Rule 65(a)(2).

Plaintiffs respectfully request that the Court hear and resolve this matter as soon as practicable to allow counties time to make adjustments before Georgia's May 2026 primary elections (and well before the General Election and future elections). *See* Favorito Decl. 13 (¶ 44).

## MEMORANDUM IN SUPPORT OF INTERIM AND MERITS RELIEF

Section I establishes this Court's jurisdiction for interim and merits relief. Sections II and III establish Plaintiffs' entitlement to interim relief and merits relief, respectively. Pursuant to Local Rule 7.1(b), Plaintiffs file a proposed procedural order to advance the merits, *see* FED. R. CIV. P. 65(a)(2), but not a proposed order for interim or merits relief. *See* LR 7.1(b).

## STATEMENT OF THE CASE

The administrative record sets forth Plaintiffs' rationales for vacating DVS Democracy Suite 5.5-A's certification, Plaintiffs' rationales for interim relief while that issue is litigated, and Defendants' bases for denying the relief that Plaintiffs requested. Although EAC may have additional items from its original certification of DVS Democracy Suite 5.5-A, the accompanying record is the "whole record" on which Plaintiffs ask the Court to rely in resolving their APA claims. *See* 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party"). In addition to the record for their APA claims, Plaintiffs also set forth additional background for those claims and the factual and legal bases for their Article III standing and irreparable harm in the following numbered paragraphs.

**DVS Democracy Suite 5.5-A's Cybersecurity Flaws**

1.  EAC certified DVS Democracy Suite 5.5-A against the then-applicable *Voluntary Voting System Guidelines*, vol. I-II (2005) ("*VVSG 1.0*") in 2018-19. AR:133.

2.  *VVSG 1.0* requires manufacturers to provide purchasing jurisdictions with voting systems capable of adhering to and enforcing operational procedures such as "effective password management." *Voluntary Voting System Guidelines*, vol. I, at 114 (§ 7.1.1) (2005). It also identifies

passwords as "information that needs to be protected" during transmissions, *id,* at 132 (§ 7.7.3), and recommends a Federal Information Processing Standards Publication—*Password Usage* (FIPS 112)—as an additional reference that is "useful in understanding and complying with [*VVSG 1.0*]." *Id.* at B-7 (Appendix B.4).

3.      Sections 3.3 through 3.7 of Federal Information Processing Standards ("FIPS") for password usage include requirements for password strength, lifetime, origination, ownership, distribution, and storage. *See* National Institute of Standards and Technology, *Password Usage*, at 11-12 (FIPS PUB 112 May 30, 1985).

4.      *VVSG 1.0* specifically includes requirements for data encryption, which include the adoption of FIPS standards as mandatory practices for protection of cryptographic keys. Specifically, *VVSG 1.0* requires "cryptographic keys … use a FIPS 140-2 level 1 or higher validated cryptographic module." *Voluntary Voting System Guidelines*, vol. I, at 122 (§ 7.4.5.1(a)(i)) (2005) (Hashes and Digital Signatures); *see also id.* at 125 (§ 7.5.1(b)(i)) (Maintaining Data Integrity); *id.* at 132 (§ 7.7.3(a)(ii)) (Protecting Transmitted Data); *id.* at 138 (§ 7.9.3) (Electronic and Paper Record Structure subsection a).

5.      Section 4.7 of FIPS 140-2 "Cryptographic Key Management" states the "security requirements for cryptographic key management encompass the entire lifecycle of cryptographic keys[,]" and "Secret keys, private keys, and [critical security parameters ("CSPs")] shall be protected within the cryptographic module from unauthorized disclosure, modification, and substitution." Nat'l Inst. of Stds. & Tech., *Security Requirements for Cryptographic Modules*, at 30 (FIPS PUB 140-2 May 25, 2001). The section also states "Secret keys, private keys, and CSPs shall be protected within the cryptographic module from unauthorized disclosure, modification, and substitution." *Id.* Section 4.7.5 "Key Storage" states "Plaintext secret and private keys shall

not be accessible from outside the cryptographic module to unauthorized operators." *Id.* at 33.

6.       On January 30, 2019, EAC's Executive Director issued DVS a Certificate of Conformance for DVS Democracy Suite 5.5-A, and his cover letter to DVS stated that "the manufacturer accepts the certification and all conditions placed on the certification." AR:395.

7.       *VVSG 1.0* requires ongoing compliance with certification standards. *See Voluntary Voting System Guidelines*, vol. I, at 147 (§ 8.1) (2005) (discussing conforming the system to meet VVSG and state and local requirements throughout the life of the system); *cf. id.* at 155 (§ 9.5) (discussing establishment of procedures to resolve identified defects).

8.       EAC's Certificate of Conformance for DVS Democracy Suite 5.5-A included a Scope of Certification, which included a section captioned "Functionality," which indicates "YES" for the line item "FIPS 140-2 validated cryptographic module." AR:397, 407.

9.       Plaintiffs' administrative petition presented new evidence that DVS Democracy Suite 5.5-A does not—and never did—meet EAC certification requirements for password security outlined in Paragraphs 2-3, *supra*, or for encryption keys outlined in Paragraphs 4-5, *supra*; AR:424-26 (¶¶ 33-44).

10.      EAC based its approval of DVS Democracy Suite 5.5-A on a test plan prepared and implemented by DVS's contractor. AR:361, 391, 423.

**Use of DVS Democracy Suite 5.5-A in Georgia**

11.      Georgia law required Georgia's Secretary of State to select an EAC-certified voting system that he or she certifies as safe to use in Georgia elections, O.C.G.A. § 21-2-300(a)(2)-(3), while reserving the Secretary's discretion to reexamine the safety finding. O.C.G.A. § 21-2-324(a) ("Secretary of State may, at any time, in his or her discretion, reexamine any voting machine").

12.      Georgia's Secretary of State certified DVS Democracy Suite 5.5-A as safe in 2019, and Georgia elections have used the system since then. *See* Favorito Decl. 14 (¶ 45) & Ex. C.

13.     DeKalb GOP sought mandamus to compel Georgia's Secretary of State to cease use of DVS Democracy Suite 5.5-A for the reasons stated in Plaintiffs' administrative petition to EAC, but—while DeKalb GOP's appeal was under submission—the Georgia Supreme Court rejected associational standing as a matter of state law, *Republican Nat'l Comm. v. Eternal Vigilance Action, Inc.*, 321 Ga. 771, 776 (2025), which prompted Georgia's Court of Appeals to find that DeKalb GOP' lacked standing to assert the rights of DeKalb GOP's voter members. *DeKalb Cty. Republican Party v. Raffensperger*, 376 Ga. App. 757, 761-62 (Ct. App. 2025) (No. A25A0831) ("*Raffensperger*").

14.     Under ¶ 14.3.1 of DVS's contract with Georgia, a court's finding DVS Democracy Suite 5.5-A "not to be … in compliance with any standard or requirement so as to require or make advisable that such Software be reworked or recalled" would trigger DVS's obligation to "perform all necessary repairs or modifications at its sole expense, provided the State determines the performance of such repairs and modifications is in the State's best interest.". *See* Favorito Decl. 3 (¶ 11) & Ex. A, at 29.

**Plaintiffs' Article III Injuries and Irreparable Harm**

15.     On October 24 & 30, 2025, Plaintiffs administratively petitioned EAC's Executive Director and Commissioners to vacate DVS Democracy Suite 5.5-A's certification and for interim relief. The petition attached two declarations and trial testimony that DVS Democracy Suite 5.5-A failed basic cybersecurity criteria required for certification. *See* AR:414, 416, 418.

16.     On November 18, 2025, through EAC's General Counsel, Defendants denied interim relief and rejected Plaintiffs' administrative petition as procedurally inconsistent with the *EAC Voting System Testing and Certification Program Manual* (the "*Manual*") and HAVA § 231(a)(1) without disputing the merits of Plaintiffs' claims. *See* AR:765-66.

17.     EAC's *Manual* affords intra-EAC administrative requests for reconsideration and

appeals only to manufacturers of election systems. *See* AR: 771, 808-13, 818-20, 834.

18.     The individual Plaintiffs are Georgia voters who intend to participate in the primary and general elections for 2026 and 2028, and the entity Plaintiffs are membership groups with similarly situated members who are Georgia voters. *See* Favorito Decl. 11 (¶ 37); Armstrong Decl. 2 (¶ 9); Biegalski Decl. 3 (¶ 10).

19.     The individual Plaintiffs and the entity Plaintiffs' voter members reasonably fear that DVS Democracy Suite 5.5-A's security flaws nullify the right to vote by enabling unauthorized third-party actors to alter electoral outcomes without detection. *See* Favorito Decl. 11 (¶ 38); Armstrong Decl. 2-3 (¶ 14); Biegalski Decl. 4 (¶ 15).

20.     EAC's denial of Plaintiffs' administrative petition deprived Plaintiffs of the procedural and informational rights that 5 U.S.C. § 555(b) and 555(e) afford the public. AR:848-49. Either interim or merits relief would afford Plaintiffs a basis to seek mandamus against the Georgia Secretary of State's gross abuse of discretion in failing to reexamine his certification of DVS Democracy Suite 5.5-A as safe for use in Georgia elections, O.C.G.A. §§ 9-6-20, 9-6-21(a), without first petitioning Georgia's Secretary of State would cost an unrecoverable $250 and would be subject to his delay, without the opportunity for interim relief. O.C.G.A. § 21-2-324(a). If this litigation against EAC is unsuccessful, plaintiff VoterGA has arranged for 10 or more Georgia voters to administratively petition the Georgia Secretary of State to reexamine DVS Democracy Suite 5.5-A's safety for a cost of $250. *See* Favorito Decl. 10-11 (¶¶ 34-36).

21.     The perception that election results can be manipulated through DVS Democracy Suite 5.5-A' cybersecurity flaws makes it more expensive and more difficult for the entity Plaintiffs to get voters to vote. *See* Biegalski Decl. 6-7 (¶ 28); Favorito Decl. 10 (¶ 32).

22.     The core mission of plaintiffs DeKalb GOP and Chatham GOP includes organizing

and encouraging eligible voters to register and to support Republican candidates at all levels of government both in their counties and statewide. In conjunction with the state and national parties, they expend considerable time and resources fighting for election security and voting integrity in Georgia to ensure that the votes and voices of their members, candidates, and party are not silenced or diluted in any way. The public's concerns about the security of electronic voting equipment and about election integrity make it more difficult to get eligible voters to vote and disengages and disillusions the public from voting, which not only makes the electoral process more expensive but also impairs the parties' ability to associate with eligible voters. *See* Biegalski Decl. 6-7 (¶ 28); *cf.* Favorito Decl. 10 (¶ 32) (similar for VoterGA's nonpartisan efforts).

23.    Although neither EAC nor—in the *Raffensperger* litigation—Georgia's Secretary of State disputed the merits of the grave security issues raised by Plaintiffs, dominant legacy media disparage election-integrity efforts by groups like DeKalb GOP and Chatham GOP as undermining democracy and constituting election denialism, misinformation, and disinformation. The same media lionize Democrat candidates—such as Stacey Abrams and Hillary Rodham Clinton—who question election results with far less evidence than Plaintiffs bring here. This media bias injures the reputation of groups like DeKalb GOP and Chatham GOP and makes it more difficult for them to connect and associate with independent voters. *See* Biegalski Decl. 4, 6-7 (¶¶ 17, 28); *cf. cf.* Favorito Decl. 9-10 (¶¶ 27-28, 32) (similar for VoterGA's nonpartisan efforts).

24.    The presence of more than 3,000 executable files modified without detection since Georgia installed its DVS Democracy Suite 5.5A system (AR:426) is consistent with malicious exploitation of DVS Democracy Suite 5.5-A's cybersecurity vulnerabilities. Plaintiff VoterGA has identified numerous additional instances of anomalous electoral events that are consistent with malicious exploitation of DVS Democracy Suite 5.5-A's cybersecurity vulnerabilities:

(a) declared the wrong winners in DeKalb 2022 Commission primary; (b) dropped 20,000 votes in four minutes for Hershel Walker in the 2022 Senate election while opponent's votes went up; (c) produced wrong results in Coffee County 2020 general election; (d) improperly rejected ballots in 2021 U.S. Senate runoff; and (e) flipped 37 votes from Biden to Trump in Ware County 2020 general election. *See* Favorito Decl. 4-5 (¶ 11) & Ex. B at 23, 25-26, 30, 32.

In lieu of a Statement of Undisputed Material Facts, *see* FED. R. CIV. P. 56(c)(1), Plaintiffs cite these numbered paragraphs in the body of this brief as "Paragraph #."

## STANDARDS OF REVIEW

The APA authorizes reviewing courts to issue interim relief, 5 U.S.C. §705, which courts evaluate under a four-factor test: (1) plaintiff's likelihood of prevailing, (2) plaintiff's irreparable harm without relief, (3) the balance of the equities, and (4) the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). With government defendants, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

On the merits, APA review under 5 U.S.C. § 706 is a question of law based on the administrative record before the agency: "When a party seeks review of agency action under the [APA], the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Lane v. United States*, 338 F. Supp. 3d 1324, 1331 (S.D. Ga. 2018) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001)). *Vacatur* in the ordinary APA remedy, *Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015), although remand without *vacatur* remains an option based on the district court's balancing of the equities. *Id.* at 1290-92; *cf.* 5 U.S.C. § 551(13) ("agency action" includes inaction).

When agencies refuse to revisit a past agency order in response to an administrative petition under 5 U.S.C. § 555(b), (e), APA review is governed by *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs*, 482 U.S. 270, 284-85 (1987) ("*BLE*"), and its progeny. *BLE* allows review

when the administrative petition presents new evidence or changed circumstances *vis-à-vis* the agency's original consideration of the order. *Id.*; *Sloan v. Drummond Co.*, 102 F.4th 1169, 1176 (11th Cir. 2024). Unless the basis for a "denial is self-explanatory," an agency's denial notice must "be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e); *Nicholson v. Brown*, 599 F.2d 639, 648 n.9. (5th Cir.), *rehearing denied*, 605 F.2d 209 (5th Cir. 1979).

When reviewing a federal administrative agency's action, a "district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether [agency action] was factually flawed." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225 (D.C. Cir. 1993); *accord Kanadu v. Kelly*, 2017 U.S. Dist. LEXIS 237397, at *6 (N.D. Ga. May 1, 2017) (No. 1:16-CV-4614-SCJ) (citing *Marshall Cty.*).

## ARGUMENT

Plaintiffs seek not only the APA preliminary interim relief of *delaying* the effective date of EAC's certification of DVS Democracy Suite 5.5-A, *see* Section II, *infra*, but also the APA permanent merits relief of *vacating* that certification. *See* Section III, *infra*; 5 U.S.C. §§ 705-706. Plaintiffs seek these inconsistent forms of relief in the alternative because DVS Democracy Suite 5.5-A never should have been certified but—until *vacatur* becomes fully final after any appeals— the certification's effective date should be pushed far enough into the future until the earlier of the merits relief's becoming final and DVS's successor obtaining certification of a cured system. In essence, DVS Democracy Suite 5.5-A is not safe for use on the merits, and DVS Democracy Suite 5.5-A should not be available for use until either the Court's judgment becomes final—inclusive of any appeals—or EAC certifies a replacement system. Plaintiffs thus ask this Court to enter the merits relief of *vacatur* in the alternative to the interim relief of delaying the effective date. *See* Sections II-III, *infra*. Although APA merits review is on the administrative record, the Court has discretion to consider witness testimony on jurisdiction and equitable factors. *Compare Four*

*Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003) (discretion to hold evidentiary hearing on *Winter-Nken* factors) *with Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1169 (11th Cir. 2018) (no hearing needed if facts are undisputed).

## I.      THE COURT HAS JURISDICTION.

Before granting interim or merits relief, federal courts must assure themselves of their jurisdiction, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), in accordance "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). This section establishes this Court's jurisdiction for both interim relief and the merits.

### A.      This Court has statutory subject-matter jurisdiction.

This action raises federal and civil-rights issues under HAVA, the APA, the Due Process Clause, and voting rights. *See* 28 U.S.C. §§ 1331, 1343(3)-(4).

### B.      The United States has waived its sovereign immunity.

The APA generally waives the United States' sovereign immunity for prospective equitable or declaratory relief, 5 U.S.C. § 702, absent a statute precluding review. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). For statutes like HAVA enacted after the APA's enactment, the statute must displace APA review *expressly*: "Subsequent statute may not be held to supersede or modify [the APA] except to the extent that it does so expressly." 5 U.S.C. § 559. Nothing in HAVA expressly supersedes the APA.

### C.      Plaintiffs have standing.

Standing's tripartite test requires: (a) judicially cognizable injury to plaintiffs, (b) causation by the challenged conduct, and (c) redressability by courts. *Lujan*, 504 U.S. at 561-62. Causation and redressability pose "little question" when the government directly regulates a plaintiff, although standing requires a heightened showing when the government regulates third parties, who

then cause injury. *Id.* Injury must be actual or imminent, not merely speculative, conjectural, or hypothetical. *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). Further, injury must be "concrete and particularized" to the plaintiff, not an "abstract generalized grievance suffered by all citizens," *Carney v. Adams*, 141 S.Ct. 493, 498-99 (2020), although widely shared injuries can be sufficiently concrete for Article III. *FEC v. Akins*, 524 U.S. 11, 24 (1998).

The requirement for injury "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) ("*SCRAP*"). The standing analysis assumes the plaintiff's merits view, *Culverhouse v. Paulson & Co.*, 813 F.3d 991, 994 (11th Cir. 2016), and requires that at least one plaintiff have standing for each claim. *California v. Texas*, 593 U.S. 659, 691 (2021) (courts "may consider the merits … if even one plaintiff has standing"); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Plaintiffs' declarations establish that *all* Plaintiffs have standing.

Plaintiffs are individual Georgia voters or entities with Georgia voters as members, which amounts to the same thing for standing. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977) (associations generally may sue on members' behalf). The DeKalb and Chatham County Republican parties also represent the distinct interests of political parties in fair elections.

### 1. Plaintiffs have standing to protect voting rights.

As applied to voting, this Circuit has adopted the formulation of the Due Process Clause's application to voting rights in *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978):

> A federally protected right "is implicated where the entire election process—including as part thereof the state's administrative and judicial corrective process—fails on its face to afford fundamental fairness."

*Curry v. Baker*, 802 F.2d 1302, 1317 (11th Cir. 1986) (quoting *Griffin*); *Burton v. Georgia*, 953 F.2d 1266, 1268 (11th Cir. 1992) (quoting *Griffin*); *Roe v. Alabama*, 43 F.3d 574, 581 (11th Cir.

1995) (citing *Griffin*). Due-process analysis focuses both on "extraordinary circumstances" beyond garden-variety "irregularities," *Burton*, 953 F.2d at 1268 (cleaned up), and on "patterns of state action that systematically deny equality in voting" and non-discriminatory laws that dilute an individual's vote. *Id.* at 1269 (cleaned up). The analysis thus "closely scrutinize[s] state laws whose very design infringes on the rights of voters," not "isolated events." *Id.* (cleaned up); *cf. Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1209 (11th Cir. 2025) (finding injury when voters allege either impaired access or "government action [that] undermines the effectiveness of their vote"). Under this rubric, DVS Democracy Suite 5.5-A's "very design infringes on the rights of voters." *Id.* Similarly, voters suffer injury when election-law violations deny them an accurate vote count or allow unlawful votes to dilute their lawful votes. *Shaw v. Reno*, 509 U.S. 630, 640-41 (1993) ("the right to vote can be affected by a dilution of voting power as well as by an absolute prohibition on casting a ballot") (cleaned up); *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). For standing purposes, dilution extends even to "a *fraction* of a vote." *SCRAP*, 412 U.S. at 689 n.14 (cleaned up). Because DVS Democracy Suite 5.5-A allows unauthorized third parties to alter votes without detection, DVS Democracy Suite 5.5-A dilutes votes, nullifies the right to vote, and violates Due Process. *See* Favorito Decl. 11 (¶ 38); Armstrong Decl. 2-3 (¶ 14); Biegalski Decl. 4 (¶¶ 15-16).

The "right to vote is individual and personal in nature," *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (cleaned up); *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001) ("one thing is clear: total and complete disenfranchisement of the electorate as a whole is patently and fundamentally unfair (and, hence, amenable to rectification in a federal court)."); *Polelle*, 131 F.4th at 1209-10 ("voting-rights claims are also concrete independent of their constitutional make-up"), so DVS Democracy Suite 5.5-A's affecting all voters does not convert Plaintiffs' injury into a generalized grievance. *Akins*, 524 U.S. at 25. DVS Democracy Suite 5.5-A relegates elections to

a glorified Ouija board.

### 2.    Plaintiffs have informational standing.

Under Plaintiffs' merits views—which this Court must accept for purposes of evaluating their standing to press those views, *Culverhouse*, 813 F.3d at 994—EAC not only must respond to Plaintiffs' administrative petition to vacate DVS Democracy Suite 5.5-A's certification but also must vacate the certification because DVS Democracy Suite 5.5-A does not meet EAC's certification standards. Under the APA, Plaintiffs are entitled to that relief, which would take the form of an EAC letter or document that Plaintiffs could provide to Georgia's Secretary of State and Georgia courts in seeking to end Georgia's use of DVS Democracy Suite 5.5-A. Significantly, Georgia law allows petitioning the Secretary of State to reexamine any previously approved voting systems, O.C.G.A. § 21-2-324(a), and mandamus under Georgia law applies not only to ministerial acts but also to gross abuses of discretion. O.C.G.A. §§ 9-6-20, 9-6-21(a). Where Georgia law independently requires EAC certification, it would be a gross abuse of the Secretary of State's discretion to reexamine DVS Democracy Suite 5.5-A's safety to continue using Democracy Suite 5.5-A after EAC vacated its certification.

### 3.    Plaintiffs have pocketbook standing.

The relief requested would save the entity plaintiffs money. First, the relief requested would eliminate the need for VoterGA to pay $250 to support an administrative petition to Georgia Secretary of State under O.C.G.A. § 21-2-324(a). *See* Paragraph 20, *supra*. Second, the two political party plaintiffs would save money that they otherwise would spend in their election efforts. *See* Section I.C.5, *infra*. "This is a classic pocketbook injury sufficient to give [the entity plaintiffs] standing." *Tyler v. Hennepin Cty.*, 598 U.S. 631, 636 (2023).

### 4.    Plaintiffs have reputational standing.

Plaintiffs' questioning of DVS Democracy Suite 5.5-A's safety aligns with questioning of

the 2020 election, which major media outlets malign as misinformation and disinformation. *See* Paragraph 23, *supra*. Whatever the merits of the 2020 election, Plaintiffs suffer reputational harm from inaccurate criticism of their challenge to the safety of DVS Democracy Suite 5.5-A and similar election systems. *See id.*, AR:450, 579, 614-15, 696-97 (other DVS systems suffer from the same flaws). A judgment compelling EAC to vacate DVS Democracy Suite 5.5-A's certification would prospectively prevent further reputational harm to Plaintiffs, which is a cognizable Article III form of injury. *TransUnion*, 594 U.S. at 417. Moreover, because the premise underlying the reputational attacks on Plaintiffs is EAC's imprimatur over DVS Democracy Suite 5.5-A's safety, Plaintiffs' risk of future and continuing reputational harm is traceable not only generally to EAC but also specifically to EAC's failure to correct its mistake in certifying DVS Democracy Suite 5.5-A.

### 5.    Political parties have standing as participants in elections.

Although the Eleventh Circuit has not yet recognized political parties' distinct interest in electoral integrity, several circuits readily allow political parties to enforce systemic interests in election-related laws. *See, e.g.*, *Mecinas v. Hobbs*, 30 F.4th 890, 897-900 (9th Cir. 2022); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). While important, political parties' standing need not be resolved here because the parties have *candidate* members, Biegalski Decl. 1, 7 (¶¶ 1, 31), and candidates have standing to ensure election integrity. *Bost v. Illinois State Bd. of Elections*, 2026 U.S. LEXIS 431, at *8 (Jan. 14, 2026). Similarly, like states, political parties have cognizable interests in avoiding fraud to ensure voter confidence in election integrity, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 (2008), as a means of keeping "honest citizens [in] the democratic process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Reaching disengaged constituents requires more effort and expense, which is its own Article III injury. *Shays v. FEC*, 414 F.3d 76, 90-91 (D.C. Cir. 2005) (relying on "basic economic logic" to find standing)

(cleaned up). Finally, disillusioned voters increase the effort and expense to get out the vote, forcing parties and their candidates to spend more time fundraising and less time campaigning, inflicting First Amendment associational injuries, *Krislov v. Rednour*, 226 F.3d 851, 857 (7th Cir. 2000) (being "required to allocate additional campaign resources ... in itself can be an injury to First Amendment rights"); *accord Nader v. Blackwell*, 545 F.3d 459, 472 (6th Cir. 2008). For these reasons, DeKalb GOP and Chatham GOP suffer additional Article III injuries.

### 6.    Plaintiffs have procedural standing.

The APA entitles Plaintiffs to an administrative procedure, which EAC unlawfully denied Plaintiffs. *See* Section III.B, *infra*. That denial inflicted *procedural* injury, which—combined with Plaintiffs' concrete injuries—lowers the Article III threshold for immediacy and redressability. *Lujan*, 504 U.S. at 571-72 & n.7 (a proper procedural-injury plaintiff "can assert that right without meeting all the normal standards for redressability and immediacy"); *cf. Summers*, 555 U.S. at 496 (plaintiffs must have concrete injury to assert procedural injury); *see also* Section I.C.2, *supra* (discussing uses of information about DVS Democracy Suite 5.5-A's losing its EAC certification in getting Georgia to reexamine use of DVS Democracy Suite 5.5-A). Procedural-rights plaintiffs have standing for a "do-over" under the proper procedures and standards, even if the remedy might produce the same result. *Akins*, 524 U.S. at 25. Neither immediacy nor redressability pose a barrier.

### 7.    Past injuries are evidence of future injury.

Plaintiffs' showing on standing is bolstered by flaws in past elections and by the multiple actors who can impair their votes. First, evidence of past injury supports standing because "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974); *cf. Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) ("history of past enforcement" is obvious evidence of "substantial" threat of future enforcement). Second, when multiple actors can cause injury, the threat of injury is increased.

*Compare Driehaus*, 573 U.S. at 164 (when "universe of potential [actor] is not restricted … there is a real risk of [future harm]" from adversaries) *with Curling v. Raffensperger*, 702 F.Supp.3d 1303, 1360 (N.D. Ga. 2023) ("Mueller Report's findings leave no doubt that Russia and other adversaries will strike again") (cleaned up), *dismissed on other grounds*, 776 F.Supp.3d 1191, 1212 (N.D. Ga. 2025). The history of injuries and number of malign actors support standing.

### 8. *Raffensperger* does not affect DeKalb GOP's standing..

Although a state court held that DeKalb GOP lacked standing under Georgia state law, that is not preclusive as to DeKalb GOP's standing here. Georgia state law allowed associational standing when DeKalb commenced its suit, but the Georga Supreme Court abrogated that doctrine after DeKalb GOP's merits appeal had been briefed. *See* Paragraph 13, *supra*; AR:420. As such, DeKalb GOP did not have an adequate opportunity to plead its institutional standing because its voter members provided standing when the suit commenced. An intervening "change in [the] applicable legal context" can displace issue preclusion. *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (cleaned up); *Montana v. United States*, 440 U.S. 147, 157-58 (1979). Moreover, federal standing differs from Georgia state law, and DeKalb GOP's filings here cure the mere pleading defects.

## II.    THE COURT SHOULD ISSUE INTERIM RELIEF.

This section shows Plaintiffs' entitlement to interim relief under the *Winter-Nken* factors. Significantly, the APA authorizes reviewing courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Judicial relief is independent of agency relief. *Id.*

### A.    Plaintiffs are likely to prevail on the merits.

The first *Winter-Nken* factor is likelihood of success on the merits, *Winter*, 555 U.S. at 20, which has two components: (1) jurisdiction to reach the merits, and (2) the merits. For both components, courts reviewing questions of interim relief also can address "any insuperable

objection, in point of jurisdiction or merits." *Munaf v. Geren*, 553 U.S. 674, 691 (2008) (cleaned up). Section I, *supra*, establishes jurisdiction, and Section III, *infra*, shows Plaintiffs' likelihood of prevailing on the merits. Accordingly, Plaintiffs satisfy the first *Winter-Nken* factor.

**B.    Plaintiffs will suffer irreparable harm without interim relief.**

The second *Winter-Nken* factor is the likelihood that the plaintiff will suffer irreparable harm without interim relief. *Winter*, 555 U.S. at 20.

In relying on HAVA § 231(a)(1) and EAC's *Manual* to deny Plaintiffs' right to petition EAC's Executive Director and its Commissioners, Defendants violated Plaintiffs' right of petition, 5 U.S.C. § 555(b); U.S. CONST. amend. I, which constitutes irreparable harm: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (freedom of association); *cf. Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (applying *Elrod* to the right of petition); *Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir. 1997) (same). EAC's sovereign immunity against money damages makes Plaintiffs' pocketbook injuries irreparable harm. *Compare LabMD, Inc. v. FTC*, 678 F.App'x 816, 822 (11th Cir. 2016) *with* Section I.C.3, *supra*. Even if damages were available (which they are not), Plaintiffs' reputational injuries would qualify as irreparable harms. *Transcon. Gas Pipe Line Co.*, 910 F.3d at 1163-64. As indicated, political parties have cognizable interests in ensuring voter confidence in election integrity. *See* Section I.C.5, *supra* (citing *Crawford*, 553 U.S. at 189; *Purcell*, 549 U.S. at 4).

The flipside to irreparable harm is "the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Legal remedies—such as damages—cannot undo any of the foregoing harms. Money damages are not recoverable, 5 U.S.C. § 702; *LabMD*, 678 F.App'x at 822. Even if EAC's proposed process adequately protected Plaintiffs' procedural rights (and it does not), EAC's proposed process will be lengthy, and EAC has denied interim relief. In the

meantime, elections will happen, and they generally cannot be undone. Faith in election results cannot be restored or mandated. No legal remedies can restore what EAC's legal errors and delay will inflict on Plaintiffs.

**C.**    **The equities and the public interest weigh in Plaintiffs' favor.**

The remaining *Winter-Nken* factors are the balance of equities and the public interest, *Winter*, 555 U.S. at 20, which merge for government defendants. *Nken*, 556 U.S. at 435. Both factors weigh in Plaintiffs' favor. Neither delaying EAC certification's effective date nor *vacatur* would impose any hardship directly on EAC. EAC has no vested right to continue false statements: "Arbitrary agency action becomes no less so by simple dint of repetition." *Judulang v. Holder*, 565 U.S. 42, 61 (2011). Similarly, neither delaying EAC certification's effective date nor *vacatur* would disrupt State's "compelling interest in preserving the integrity of its election process" *Purcell*, 549 U.S. at 4, because HAVA does not impose EAC certification on the States. Georgia law requires EAC certification, O.C.G.A. § 21-2-300(a)(3), and Georgia would be free to determine for itself how to proceed if the EAC certification on which it relied was deficient. If EAC's certification was wrongly granted, Georgia should know that now, not years from now.

Neither DVS nor its successor have any cognizable interest is avoiding *vacatur* or a delayed effective date. DVS's certification relied on false information submitted to EAC, and DVS has known that for years. AR:408-09, 424-25 (¶¶ 34-35). Even if DVS had no duty to correct under 18 U.S.C. § 1001(a), DVS's unclean hands preclude weighing the impact on DVS in balancing the equities. O.C.G.A. § 23-1-10 ("[those] who would have equity must do equity"); *cf. Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150-51 & n.2 (5th Cir. 1985) (equitable defense require clean hands); *In re Mut. Leasing Corp.*, 449 F.2d 811, 815 (5th Cir. 1971) ("there is no authority by which equity can come to the aid of an illegal and fraudulent scheme, regardless of the beneficence of the ultimate purpose"). If this Court considers DVS at all, the Court should consider

only that finding DVS Democracy Suite 5.5-A to fail EAC standards would require DVS to bring the system into compliance under DVS's contract with Georgia, *See* Paragraph 14, *supra*.

The public interest favors rooting out flaws in election systems before elections take place: "protecting public confidence in elections is deeply important—indeed, critical—to democracy." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019); *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("generally no public interest in the perpetuation of unlawful [EAC] action"). Indeed, the public has a compelling interest in dispelling unnecessary confusion in the marketplace. *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008) (trademark context, collecting cases); *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 127 (4th Cir. 2011) (in Lanham Act context, "it is self evident that preventing false or misleading advertising is in the public interest in general"). Although *Angel Flight* and *PBM Products* involved the commercial marketplace, their holdings apply to the marketplace of ideas. EAC's imprimatur of perceived competence should not support continued use of DVS Democracy Suite 5.5-A if EAC's certification of that flawed system was wrongly granted in the first place. Indeed, EAC's proposed delay here demonstrates an agency that is either incompetent or else hopelessly captured by the industry it purports to regulate. The public has an urgent interest in candor.

### D.    Plaintiffs' motion for interim relief is timely.

Although timeliness is not expressly a *Winter-Nken* factor for interim relief under 5 U.S.C. § 705, Plaintiffs address timeliness because of the apparently anomalous circumstance of a 2025 motion to extend a 2019 effective date. Plaintiffs' motion is timely *vis-a-vis* EAC's 2025 denial, and the APA expressly contemplates "postpone[ing an agency action's] effective date" as well as the more general "all necessary and appropriate process … to preserve s… rights." 5 U.S.C. § 705. Both prongs of 5 U.S.C. § 705 authorize relief after an action has taken effect. *See*, *e.g.*, *Cabrera*

*v. U.S. Dep't of Labor*, 792 F. Supp. 3d 91, 106 (D.D.C. 2025) (delaying effective date of agency action that had taken effect); *accord All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254-56 (5th Cir. 2023) (affirming same), *rev'd and remanded on other grounds sub nom. Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 397 (2024). Moreover, nothing in HAVA, any other statute, or EAC's regulations governs the timing of intra-EAC appeals by the public generally. *See* Paragraph 17, *supra*. Timeliness should enter this Court's analysis solely on the issue of laches (*i.e.*, unreasonable and prejudicial delay). *Coffey v. Braddy*, 834 F.3d 1184, 1189 (11th Cir. 2016). EAC cannot show that Plaintiffs unreasonably delayed seeking review once they had notice of DVS Democracy Suite 5.5-A's security flaws, and—in any event— EAC cannot show prejudice. For their part, Georgia, and DVS—who lack a protectible interest in maintaining an uncertifiable system—have known about these flaws for years and have done nothing. AR:408-09, 424-25 (¶¶ 34-35). Untimeliness in not an issue here.

## III.    THE COURT SHOULD ISSUE MERITS RELIEF.

This section shows Plaintiffs' entitlement to merits relief under the APA.

### A.    The Court should advance the merits under Rule 65(a)(2).

For both judicial economy and expedition, the Court should advance consideration of the merits to a hearing on interim relief. *See* Fed. R. Civ. P. 65(a)(2). The substantive merits are a pure issue of law, *Marshall Cty.*, 988 F.2d at 1225; *Kanadu*, 2017 U.S. Dist. LEXIS 237397, at *6, so the only issues that potentially require a merits trial or evidentiary hearing are the factual issues around standing and irreparable harm, which relate to both interim relief and the merits. *See Lujan*, 504 U.S. at 561 (standing evaluated at successive stages of litigation); *Lyons*, 461 U.S. at 103 (standing required for interim relief); *compare* Section II.B, *supra*, *with* Section III.E, *infra* (irreparable harm relevant to both interim and merits relief). There is no reason to await EAC's position on the merits.

Even before the Supreme Court cashiered "*Chevron* deference" under the obligation of courts—not agencies—to determine legal questions, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) (overruling *Chevron, U.SA., Inc. v. NRDC,* 467 U.S. 837, 863-64 (1984)), agency deference had at least two relevant limits. First, *Chevron* deference did not require courts to wait for agencies to act. *Consolidation Coal Co. v. Fed'l Mine Safety & Health Review Comm'n*, 824 F.2d 1071, 1080 n.8 (D.C. Cir. 1987). Second, statutes such as the APA—that apply equally to multiple agencies—do not give any agency unique interpretive authority. *Wachtel v. O.T.S.*, 982 F.2d 581, 585 (D.C. Cir. 1993); *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 643 n.30 (1986) (plurality). But deference to EAC has no place here because the relevant field here—namely, "legal interpretation" of the record—is "emphatically the province and duty of the judicial department." *Loper Bright*, 603 U.S. at 412 (cleaned up). For an easy case like this, EAC's dilatory disinterest poses no obstacle to the Court's reaching the merits.

Although interim relief generally merges with merits relief, *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 314 (1999); *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1361 n.25 (11th Cir. 2021), the merits relief of *vacatur* is inconsistent with interim relief of delaying certification's effective date. Plaintiffs request both forms of inconsistent relief in the alternative—as FED. R. CIV. P. 8(a)(3) allows—and respectfully submit that the possibility of appeal warrants both forms of relief to protect Plaintiffs and the public during any appeal.

### B.    Neither HAVA § 231 nor EAC's *Manual* displace APA review.

EAC cites its *Manual* and HAVA § 231(a)(1) as precluding the APA relief Plaintiffs seek. AR:766. The cited statute merely directs EAC to "provide for the testing, certification, decertification, and recertification of voting system hardware and software *by accredited laboratories*," 52 U.S.C. § 20971(a)(1) (emphasis added), without addressing review by affected members of the public like voters or political parties. Similarly, the *Manual* provides rights to

appeal or to seek reconsideration only to manufacturers. *See* Paragraph 17, *supra*. By contrast, the APA provides a right of judicial review to *any* "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, and "higher-level agency reconsideration by the agency head is the standard way to maintain political accountability and effective oversight for adjudication that takes place outside the confines of § 557(b)." *United States v. Arthrex, Inc.*, 594 U.S. 1, 20 (2021) (cleaned up). EAC's efforts at delay suffer from two independently fatal defects.

First, post-APA statutes like HAVA must displace the APA expressly. 5 U.S.C. § 559; *Dickinson*, 527 U.S. at 155. As indicated, nothing in HAVA expressly supersedes the APA.

Second, the *Manual* is simply silent on how non-manufacturers may seek the Commissioners' review. The APA's "'generous review provisions' must be given a 'hospitable' interpretation'" that courts can restrict "'only upon a showing of clear and convincing evidence' of a contrary legislative intent.'" *Am. Fed'n of Gov't Emps., Local 2017 v. Brown*, 680 F.2d 722, 725 n.11. (11th Cir. 1982) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141 (1967)). Here, there is no evidence whatsoever of a contrary legislative intent. Moreover, even if the *Manual* and HAVA § 231(a)(1) somehow constituted "special statutory review" under the APA's terms—and they plainly are not—they still would not displace APA review "in the absence or inadequacy" of that special statutory review. 5 U.S.C. § 703. Because neither the *Manual* nor HAVA provide non-manufacturers an avenue for review, review under the *Manual* is absent and inadequate for non-manufacturers, which puts review in federal district court. 5 U.S.C. § 703.

### C.    Defendants' denials are reviewable under the APA and *BLE*.

EAC cannot credibly dispute that Plaintiffs' administrative petition presented new evidence that EAC did not consider when originally certifying DVS Democracy Suite 5.5-A. The petition attached two declarations and extensive trial testimony that DVS Democracy Suite 5.5-A

failed basic cybersecurity criteria required for certification. AR:424-26 (¶¶ 33-44) (EAC wrongly found that DVS Democracy Suite 5.5-A complied with EAC certification standards); Paragraphs 2-5, *supra* (same). Under the circumstances, the EAC Executive Director's and Commissioners' denials (*i.e.*, Counts I and II of the Complaint) are reviewable under *BLE* and its progeny because Plaintiffs submitted new evidence. *BLE*, 482 U.S. at 284-85; *Sloan*, 102 F.4th at 1176; *cf. Darby v. Cisneros*, 509 U.S. 137, 147 (1993) (intra-agency appeals required by statute or rule are mandatory, but optional intra-agency appeals are not). More basically, the EAC Commissioners' refusal to review the Executive Director's flawed approval is reviewable simply as agency action. *See* 5 U.S.C. § 704 (final agency action reviewable); *Arthrex*, 594 U.S. at 20 ("higher-level agency reconsideration by the agency head is the standard way to maintain political accountability and effective oversight for adjudication that takes place outside the confines of § 557(b)") (cleaned up). Although EAC's *Manual* addresses appeals by *manufacturers*, *see* Paragraph 17, *supra*, the *Manual* is silent on everyone else, which leaves such appeals available and optional.

**D.    Defendants' actions are unlawful.**

Defendants' response[1] to Plaintiffs' administrative petition involves three distinct forms of EAC action: (1) the Executive Director's failing to reopen the merits of his predecessor's prior certification; (2) the Commissioners' failing to review the merits of that prior certification in their capacity as head of EAC; and (3) both the Executive Director's and the Commissioners' failure to

---

[1]    Although EAC's General Counsel acted on Plaintiffs' administrative petition, AR:767, 850, that action binds the EAC principals. When parties "voluntarily cho[o]se [an] attorney as [their] representative," they "cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633-34 & n.10 (1962); *cf. Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 92-93 (1990) (*Link* applies to administrative proceedings), *modified in part on other grounds*, Civil Rights Act of 1991, PUB. L. NO. 102-166, § 114(1), 105 Stat. 1071, 1079. Thus, "each party is deemed bound by the acts of his lawyer-agent." *Link*, 370 U.S. at 634; *Dos Santos v. U.S. Att'y Gen.*, 982 F.3d 1315, 1319 (11th Cir. 2020) (citing *Link*).

grant interim relief in conjunction with their merits respective reviews. As indicated, EAC's defense to APA review was plain error, AR:848-49; Sections III.B-III.C, *supra*, and thus void as "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). With EAC's procedural defense thus dispatched, EAC's allowing DVS Democracy Suite 5.5-A's certification to remain extant is "arbitrary, capricious, [and] an abuse of discretion," *id.* § 706(2)(A), and "unwarranted by the facts." *Id.* § 706(2)(F).[2] When an agency approval does not meet the criteria required for the approval, a reviewing court must reject the approval. *See, e.g., Sierra Club v. Martin*, 168 F.3d 1, 5 (11th Cir. 1999) (arbitrary and capricious for agency to approve action without gathering information required to assess action's compliance with agency's standards). Significantly, EAC's action, without disputing the merits, "must … stand or fall on the propriety of [EAC's] finding[s]." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). "In the face of these apparently substantial charges, [the agency] was largely unresponsive. … This will not do as reasoned decisionmaking." *Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1166-68 (D.C. Cir. 1987). Leaving DVS Democracy Suite 5.5-A's certification in place violated the APA, no matter which standard of review applies.

### E.      *Vacatur* **is the appropriate remedy.**

EAC never should have certified DVS Democracy Suite 5.5-A, so vacating the certification is the appropriate remedy. *Black Warrior Riverkeeper*, 781 F.3d at 1290. The alternate remedy of remand to EAC without *vacatur* would require the equities to balance in EAC's favor, *id.* at 1290-

---

[2]      Because EAC did not conduct a public process to evaluate DVS's certification, it is unclear whether this Court should apply the typical arbitrary-and-capricious review or the less usual *de novo* review to Plaintiffs' challenge. APA *de novo* review is warranted "when the action is adjudicatory in nature and the agency factfinding procedures are inadequate**.**" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Porter v. Califano*, 592 F.2d 770, 782-83 (5th Cir. 1979). Here, EAC relied on a DVS-supplied testing lab review and did not provide the public an opportunity to participate. Plaintiffs respectfully submit that *de novo* review is warranted.

92, but the equities balance *against* EAC and DVS. *See* Section II.C, *supra*. In addition, deciding to remand without *vacatur* also "depends *inter alia* on the severity of the errors [and] the likelihood that they can be mended without altering the order." *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (citing *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C. Cir. 1990)). Here, EAC's error was egregious, and there is no chance of whether DVS Democracy Suite 5.5-A's certification order can be cured. Instead, remand without *vacatur* would simply allow a recalcitrant and dilatory EAC to dawdle while DVS's successor develops a new system to replace DVS Democracy Suite 5.5-A.

<u>**CONCLUSION**</u>

WHEREFORE, the Court should both enter a final judgment vacating EAC's certification of DVS Democracy Suite 5.5-A *ab initio* and issue interim relief—to apply until this Court's judgment become fully final including any appeals—to delay the effective date of EAC's certification of DVS Democracy Suite 5.5-A to January 21, 2029.

Dated: January 16, 2026                     Respectfully submitted,

/s/ Harry W. MacDougald                     /s/ Jonathan R. Miller, III
Harry W. MacDougald, Ga. Bar No. 463076     Jonathan R. Miller, III, Ga. Bar No. 141908
Caldwell, Carlson, Elliott & Deloach, LLP   PMB173
6 Concourse Parkway, Suite 2400             5420 New Jesup Hwy
Atlanta, Georgia 30328                      Brunswick, GA 31523
(404) 843-1956                              (912) 617-3169
hmacdougald@ccedlaw.com                     jrmilleratty@gmail.com

Admitted *pro hac vice*                     /s/ Lawrence J. Joseph
                                            Lawrence J. Joseph
                                            Law Office of Lawrence J. Joseph
                                            1250 Connecticut Ave, NW, Ste. 700
                                            Washington, DC 20036
                                            202-899-2987
                                            ljoseph@larryjoseph.com

                                            Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2026, I electronically filed the foregoing motion—together with the accompanying exhibits and proposed order—with the Clerk of the Court for the U.S. District Court for the Southern District of Georgia by using the CM/ECF system, which caused the service of counsel for the parties.

/s/ Lawrence J. Joseph
Lawrence J. Joseph, admitted *pro hac vice*
*Co-Counsel for Plaintiffs*