**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| VOTERS ORGANIZED FOR TRUSTED ELECTION RESULTS IN GEORGIA, et al., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:25-cv-316-RSB-CLR |
| | ) | |
| ELECTION ASSISTANCE COMMISSION, et al., | ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CORRECTED EMERGENCY
MOTION FOR INTERIM AND MERITS RELIEF**

**INTRODUCTION**

Plaintiffs, two Georgia-registered voters and three Georgia-based organizations, seek the "extraordinary and drastic remedy" of a universal preliminary injunction against the Election Assistance Commission (EAC)'s certification of the Dominion Voting Systems Democracy Suite 5.5-A (Suite 5.5-A)—a voting system that EAC certified back in 2019. Plaintiffs take issue with what they assert are "glaring cybersecurity flaws" in this voting system. Pls.' Corrected Emergency Mot. & Mem. for Interim & Merits Relief ("Br.") p. 1, ECF No. 29. This suit is based on the EAC's response to their petition seeking decertification of that certification. The EAC denied that relief, and instead followed its own published procedures, which call for, first, an "informal inquiry" if there is reason to believe that decertification may be appropriate, and, second, a more formal inquiry (with the participation of the voting system vendor) if that threshold inquiry found cause to proceed. The first step of that process, an informal inquiry, is ongoing. Plaintiffs are apparently concerned that the EAC followed its own procedures and is

1

conducting a diligent inquiry.  But such compliance with the law is not the stuff of a successful APA suit.  For this reason, and others before it, Plaintiffs' request for relief ought to be rejected.

At the outset, Plaintiff's Motion is plainly devoid of "proof of irreparable injury [which] is an indispensable prerequisite to a preliminary injunction," so the Court should deny the Motion on that ground alone, and need go no further.  *See Siegel v. LePore,* 234 F.3d 1163, 1179 (11th Cir. 2000).

Even if the Court looks past this fatal defect, Eleventh Circuit law also requires that Plaintiffs "clearly establish[]" that they have "a substantial likelihood of success on the merits"— and the Motion falls far short of this.  *Id*. at 1176 (citation omitted).

Plaintiffs lack Article III standing even to be heard in this Court.  The Eleventh Circuit (along with numerous other courts) has rejected Plaintiffs' central theory of Article III injury, "vote dilution," and Plaintiffs' purported "pocketbook injuries." Their other standing theories are also baseless.  Defects in causation and redressability also defeat standing.  Plaintiffs claim that they are injured by Georgia's use of Suite 5.5-A, but it is the decision of the Georgia Secretary of State to use this system (and not EAC's certification) which causes Plaintiffs' alleged injuries. And even if the Court grants relief sought, redress depends upon the independent actions of the Georgia Secretary of State—a third party not before this Court—as to whether to continue or discontinue using this system.

Finally, even looking past jurisdiction, Plaintiffs do not make a "clear" showing that EAC violated the APA. As explained below, EAC followed its procedures for a decertification process. It is not arbitrary and capricious for an agency to refuse to violate its own procedures.  And Plaintiffs' efforts to have this Court interrupt EAC's active and ongoing inquiry would turn the equities on their head.  The Court should deny the Motion.

**BACKGROUND**

The Help America Vote Act of 2002, Pub. L. No. 107-252, 116 Stat. 1666 (codified at 52

U.S.C. §§ 20901, *et seq*.) ("HAVA"), established the EAC, and charged it to "provide for the

testing, certification, decertification, and recertification of voting system hardware and software

by accredited laboratories." HAVA § 231(a)(1), at 52 U.S.C. § 20971(a)(1). In response to this

HAVA requirement, the EAC developed the Voting System Testing and Certification Program

(the VSTC Program), and the procedural requirements for that program are set forth in the EAC

Voting System Testing and Certification Program Manual Version 3.0 (effective Nov. 15, 2022)

("the VSTC Manual"). *See* ECF No. 12-2, p. 768 of 850, at p. 770 at §§ 1.1-1.5 (Introduction)

(at AR-770, as demarked by Plaintiffs);[1] *see also generally*, *Graeff v. U.S. EAC*, No. 4:22-cv-

682, 2023 WL 2424267, at *1 (E.D. Mo. Mar. 9, 2023). Pursuant to this framework, EAC

certified Suite 5.5-A on January 30, 2019 (*see* AR-395), and around that time the State of

Georgia purchased it and deployed it for use in its elections. Suite 5.5-A is a paper-based optical

scan voting system consisting of multiple components, including an Election Management

System. *See* AR-365. At base, the Plaintiffs have brought this litigation to cease the use of Suite

5.5-A in Georgia elections.

The backdrop to this case is the unsuccessful Georgia state court litigation brought by

DeKalb County Republican Party (DeKalb GOP), one of the Plaintiffs here. The Georgia Court

of Appeals explained how that litigation arose:

> In 2019, the State of Georgia, pursuant to statute, moved from conducting elections
> using a "direct recording electronic" voting system to a uniform voting system that
> produced paper ballots marked by an electronic ballot marking device, which would
> display voters' choices in a format readable by voters, and that would be scanned and
> tabulated by ballot scanners. As part of the transition, the General Assembly imposed,

---

[1] For ease of reference, Defendants refer to attachments to the Motion (which Plaintiffs describe
as the "Administrative Record") by the "AR" number. To be clear, this does not constitute the
actual Administrative Record as certified by the agency, which has not been produced.

in relevant part, two statutory requirements for the selection of the new voting system. Specifically, under the newly-revised OCGA § 21-2-300(a)(3), any new voting system consisting of electronic ballot markers and ballot scanners was required to be "certified by the [EAC] prior to purchase, lease, or acquisition" by the State. *See* OCGA § 21-2-300(a)(3). Additionally, under OCGA § 21-2-300(a)(2), the Secretary was to certify the voting system as "safe and practicable for use," before it was to be deployed for use in all federal, state, and county elections within the State. *See* OCGA § 21-2-300(a)(2). The particular voting system selected by the Secretary [(Suite 5.5-A)] was certified by the EAC on January 30, 2019, prior to the State's purchase of the system in July 2019. Around the same time the State purchased the voting system, the Secretary certified it as "safe and practicable for use" in advance of it being deployed for use in elections.

*DeKalb Cnty. Republican Party, Inc. v. Raffensperger*, 921 S.E. 2d 23, 25 (Ga. App. Ct. 2025) (first alteration in original) (footnotes & citations omitted). With this backdrop, in August 2024, DeKalb GOP "sought to compel the [Georgia Secretary of State] to comply with what it contends is the Secretary's ongoing duty under OCGA § 21-2-300(a) to ensure that Georgia's uniform electronic voting system complies with certification standards of the [EAC]." *Id*. at 25. Claiming that the system "stored encryption keys in unprotected plain text," DeKalb GOP alleged that the "Secretary's ongoing failure to bring the State's voting system into compliance with [EAC] requirements constituted a gross abuse of his discretion." *Id*. at 26. Ultimately, "the trial court dismissed [DeKalb GOP's] application, finding that according to the plain language of the [state] statute, the Secretary had only a *one-time*, temporal duty to ensure EAC certification 'prior to [the] purchase, lease, or acquisition' of the voting system and a similar *one-time* duty to certify that system as 'safe and practicable for use' in advance of the system being used in elections." *Id*. (emphasis added) (quoting OCGA § 21-2-300(a)(2) and (3)). In other words, the court "determined the plain language of the statute did not impose an *ongoing* duty on the Secretary related to the certifications required by OCGA § 21-2-300(a)(2) and (3) . . . ." *Id*. (emphasis added). DeKalb GOP appealed, and in its opinion, the Georgia Court of Appeals

affirmed the dismissal of DeKalb GOP's application for lack of standing in September 2025.  *See id.* at 33.

Unable to obtain relief in state court, DeKalb GOP then filed an administrative petition to EAC. DeKalb was joined by three of the other plaintiffs here, Voters Organized for Trusted Election Results in Georgia ("VoterGA"), Mr. Garland Favorito (VoterGA's co-founder), Mr. Richard Armstrong (a VoterGA member), and certain other petitioners—but not the Chatham County Republican Party (collectively, the "Original Georgia Petitioners.").  On October 30, 2025, they filed an "Amended Emergency Administrative Petition to Vacate Certification of Dominion Voting Systems Democracy Suite 5.5-A and for Interim Relief" (the "Petition to Vacate").  *See* ECF No. 12-2, p. 418 of 850 (demarked AR-418).  The Petition to Vacate claimed "new information that [] Suite 5.5-A fails to meet EAC's certification standards," and in short, requested that by November 20, 2025 (*i.e.* within three weeks), that EAC either rescind EAC's certification of Suite 5.5-A, or forward the effective date of certification to 2027.[2]  *See* AR-418, 430.

The Petition to Vacate did not include any reference to EAC's nearly 80-page VSTC Program Manual (AR-768-846), which, as explained above, "establishes the Program's operations and administrative requirements for voting system testing and certification," and as relevant to the Petition to Vacate, includes an entire section for decertification.  *See* AR-813-820. Specifically, the decertification section explains, in part:

> **Decertification Policy**. Decertification is the process by which the EAC revokes a certification previously granted to a voting system.  It is an important part of the program because it serves to ensure the VVSG and requirements of the Program are followed and that certified voting systems maintain the same level of quality as those presented for testing. . . . .

---

[2] The relief sought in the Petition to Vacate is set forth in the three bullets points in the "Requested Relief" section of the petition.  *See* AR-430.

> Decertification is initiated when the EAC receives information from a source that has used, tested, or observed that a voting system may not be in compliance with the VVSG or the procedural requirements of this manual.  Upon receipt of this information, the Program Director must initiate an informal inquiry to determine if the reported information is accurate.  If the information is accurate and suggests the system is non-compliant, a formal investigation will be initiated. If the results of the formal investigation demonstrate noncompliance, the manufacturer will be provided a notice of noncompliance.  Before a final decision on decertification is made, the manufacturer will have the opportunity to remedy any defects identified in the voting system and present information for consideration . . . .

VSTC Manual § 7.1 (AR-813).  The VSTC Manual also provides specific procedures on informal inquiries:

> An informal inquiry is the first step taken when information is presented to the EAC that suggests a voting system may not be in compliance with the VVSG requirements or the procedural requirements of this manual.  The sole purpose of the informal inquiry is to determine whether a formal investigation is warranted.  The outcome of an informal inquiry is limited to a decision on referral for investigation.

VSTC Manual § 7.2 (Informal Inquiry) (AR-813).  The Manual concludes, "If the Program Director determines a matter requires a formal investigation, the Program Director must refer the matter in writing to the Decision Authority [(EAC's Executive Director or designee)]" and "recommend a formal investigation . . . ." VSTC Program Manual § 7.2.3 (Referral) (AR-814).

EAC responded to the Petition to Vacate by letter dated November 18, 2025, and it based its response on the VSTC Program Manual (including a copy of the Manual with the response). *See* AR-765 (the "EAC Response").  The EAC Response explained that while it was "notice of a denial of the requested relief" (*i.e.,* the request for rescission of EAC's certification of Suite 5.5-A, or forwarding the effective date of certification to 2027), AR-765, the letter also apprised of the commencement of an informal inquiry pursuant to the VSTC Program Manual.  *See* AR-766. ("the information you submitted has been forwarded to the EAC Program Director" who, "[p]er the Program Manual . . . . must initiate an informal inquiry to determine if the reported system is

accurate.")  The EAC Response Letter continued, "If the information is accurate and suggests the system is non-compliant, a formal investigation will be initiated." *Id*.

The Response Letter explained that given the procedural requirements in the Manual, "[g]ranting any of the relief you requested would require that the EAC take arbitrary agency action."  AR-765; *see also* AR-766 ("Removing a certification prior to the completion of this process would be arbitrary, and therefore the interim relief requested in your submission will also not be granted.").  In denying the request to forward the effective date of the 2019 certification, the Response Letter relied upon Section 5 of the VSTC Manual (Grant of Certification):

> [Y]ou request that the EAC change the date of certification to January 15, 2027 . . . . This is requesting that the EAC take an action that is arbitrary on its face.  Per Section 5 of the Program Manual, the grant of certification is the formal process through which the EAC acknowledges that a voting system has successfully completed conformance testing to a current version of the VVSG. Forward dating a prior grant of certification has no foundation in law or policy. This is a self-explanatory denial, and as such this relief cannot be granted.

*Id*. at 766.

In turn, in a letter dated November 24, 2025, an "expanding coalition of administrative petitioners" replied, including both the Original Georgia Petitioners now joined by Chatham County Republican Party (Chatham GOP), and disputed the EAC Response Letter.  *See* AR-847-49.  Finally, in a November 28 email, EAC's General Counsel confirmed that EAC had initiated the informal inquiry referenced in the EAC Response Letter.  AR-850.

About one month later, on December 29, Plaintiffs (DeKalb GOP, Chatham GOP, VoterGA, and Messrs. Favorito and Armstrong) filed their complaint in this case.  The complaint asserts two counts under the APA—Count I (APA claim against the EAC Executive Director) and Count II (APA claim against the EAC Commissioners)—and no other causes of action.  *See*

Compl. pp. 38-40, ECF No. 1.[3]  Plaintiffs simultaneously filed a "Motion for Interim and Merits Relief" (ECF No. 12), which on January 16, 2026, they refiled and restyled this as the Corrected Emergency Motion now pending.  The Motion seeks nationwide injunctions in the form of (1) "APA preliminary interim relief of *delaying* the [2019] effective date of EAC's certification of . . . Suite 5.5-A" to January 21, 2019, and (2) alternatively, the "APA permanent merits relief of *vacating* that certification."  Br. 9 (emphasis in original).[4]

Beyond these nationwide injunctions, Plaintiffs also ultimately seek a declaratory judgment (also in nationwide character) that:

   (i)     "[The EAC VSTC Program Manual] is inconsistent with the non-manufacturer public's rights of petition and review under [the APA] and, as such, a nullity or irrelevance as to the non-manufacturer public's rights of petition and review."

   (ii)    "Suite 5.5-A's security flaws—including making encryption keys available in plain text and relying upon unchanged, hardcoded passwords—make that system uncertifiable under the [HAVA] and unsafe for use in elections."

   (iii)   "Any election system that makes encryption keys available in plain text"— or "that relies upon hard coded passwords"—cannot be certified pursuant to the [HAVA].

Compl. - Prayer for Relief.

---

[3] The preamble to the complaint states that the action is pursuant to the APA, HAVA, and the Due Process Clause.  Compl. at 1.  *See also, id.* at ¶ 65 (this action "arise[s] under the APA, HAVA, the federal Constitution, and Georgia law . . . .").  The Motion echoes that. *See* Br. 10. But the Civil Cover Sheet confirms the sole cause of action is the APA.  *See* ECF No. 1-1, § VI (Cause of Action).  Indeed, there is no private right of action under HAVA.  *See, e.g., Oels v. Dunleavy*, No. 3:23-cv-6, 2023 WL 3948289, at *3 (D. Ak. June 12, 2023).

[4] The Motion also makes the procedural request under Fed. R. Civ. P. 65(a)(2) to "advance consideration of the merits to a hearing on interim relief," *see* Br. 20.  The Court should deny this request, where, as explained below, it Court lacks jurisdiction even to hear this case.

## LEGAL STANDARD

Plaintiffs omit any reference to Eleventh Circuit's actual requirements for the preliminary injunction they seek.  As a result, the relief sought in the Motion is disconnected from the underlying legal requirements.  The Eleventh Circuit has specified, "In this Circuit, a preliminary injunction is an extraordinary and drastic remedy ***not to be granted unless*** the movant **clearly** established the burden of persuasion ***as to each of the four prerequisites***.  *Siegel*, 234 F.3d at 1176 (emphasis added).  Specifically:

> [T]he plaintiff must plainly establish four preconditions:  (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a showing that plaintiff will suffer irreparable injury if an injunction does not issue, (3) proof that the threatened injury to plaintiff outweighs any harm that might result to the defendants, and (4) a showing that the public interest will not be disserved by grant of a preliminary injunction.

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("*Gen. Contractors*"); *see also*, *Siegel*, 234 F.3d at 1176.  The third and fourth elements merge when, as here, the party opposing the preliminary injunction is the government. *Florida v. HHS,* 19 F.4th 1271 (11th Cir. 2021).  As reflected above, "the 'failure to meet even one' of the four prerequisites <u>requires</u> denial of a preliminary injunction."  *Smith v. Universal Prop. & Cas. Ins. Co.*, No. 3:25-cv-700, 2025 WL 3534574, at *1  (N.D. Fl. Aug. 7, 2025) (*quoting Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (emphasis added).  As another judge of this District explained, "[w]hen a court employs the extraordinary remedy of injunction it directs the conduct of a party, and does so with the backing of its full coercive powers.  A court should only exercise this power in the *rarest of circumstances.*" *Donjon-SMIT, LLC v. Schultz*, 449 F. Supp. 3d 1345, 1358 (S.D. Ga. 2020) (Wood, J.) (emphasis added) (citations and quotation marks omitted).

## ARGUMENT

### I.    Plaintiffs Fail to Show Imminent, Irreparable Harm.

The Court should begin (and here, end) its analysis with irreparable harm: "Because proof of irreparable injury is an indispensable prerequisite to a preliminary injunction, [p]laintiffs are not entitled to a preliminary injunction" without it. *See Siegel*, 234 F.3d at 1179.[5] "A showing of irreparable harm is the *sine qua non* of injunctive relief"—and indeed, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." *Gen. Contractors*, 896 F.2d at 1285 (citation omitted).

Plaintiffs' first irreparable harm argument claims that in "relying on HAVA § 231(a)(1) and EAC's Manual to deny Plaintiffs' right to petition EAC's Executive Director and its Commissioners," Defendants violated Plaintiffs' First Amendment right of petition—and that this purported constitutional violation, *ipso facto*, "unquestionably constitutes irreparable harm" under *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (and other cases). *See* Br. 17. At the outset, *Elrod* is a First Amendment case, but Plaintiffs never argue in their claims for relief that the EAC has violated their First Amendment rights; their motion's merits section is devoid of any First Amendment analysis. *See* Compl. – Counts I and II (¶¶ 149-160); Br. 23-24. Nor do Plaintiffs explain how EAC's processing and response to the Petition to Vacate violated the First Amendment, even under Plaintiffs' (incorrect) characterization of the November 18, 2025 EAC Response letter. *See* Br. 5 at ¶¶ 15-16; *cf.* AR-765-67. Plaintiffs cannot bootstrap a purported First Amendment injury that they make no attempt to even plead, let alone establish, as a basis

---

[5] *See also Hoop Culture, Inc. v. Gap Inc*, 648 F. App'x 981, 986 (11th Cir. 2016) (quoting same). "Significantly, even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel,* 234 F.3d at 1176. *See also Gen. Contractors*, 896 F.2d at 1285 ("We need not address each element because we conclude that no showing of irreparable injury was made.").

for justifying irreparable injury.  Nor, on the merits, could they make a showing of First

Amendment violation—the EAC responded to their petition with a reasoned, adequate

explanation.  Plaintiffs just don't like the answer.  But Plaintiffs' First Amendment petition rights

do not require the Government to agree with them.  *See generally, DeMartini v. Town of Gulf*

*Stream*, 942 F.3d 1277, 1288 (11th Cir. 2019) (describing the First Amendment right to petition).

But even if Plaintiffs could establish a violation, the Eleventh Circuit has limited this

construction of *Elrod* to cases involving the right of privacy and free speech claims, which are

not present here.  Specifically, in *Siegel,* 234 F.3d at 1176-78, where plaintiffs sought a

preliminary injunction against a vote recount which allegedly violated First Amendment and

other constitutional rights, the Eleventh Circuit rejected plaintiffs' contention that "a violation of

constitutional rights always constitutes irreparable harm":

> Our case law has not gone that far . . . . The only areas of constitutional jurisprudence
> where we have said that an on-going violation may be presumed to cause irreparable
> injury *involve the right of privacy and certain First Amendment claims establishing*
> *an imminent likelihood that pure speech will be chilled or prevented altogether.* . . .
> This is plainly not such a case.

(emphasis added) (citations omitted).  *See also*, *e.g.*, *Gen. Contractors,* 896 F.2d at 1285-86

(rejecting district court's conclusion that irreparable harm "can properly be presumed from a

substantially likely equal protection violation," and explaining that "[t]he only area of

constitutional jurisprudence where we have said that an on-going violation constitutes irreparable

injury is the area of first amendment and right of privacy jurisprudence,"  where "chilled free

speech and invasions of privacy, because of their intangible nature, could not be compensated for

by monetary damages; in other words, plaintiffs could not be made whole.");  *see also, Brown v*

*Azar*, 497 F. Supp. 3d 1270, 1293 (N.D. Ga. 2020) (Boulee, J.) ("Merely asserting a

constitutional claim is insufficient to trigger a finding of irreparable harm," and explaining that in

any event, "This case involves neither free speech nor invasion of privacy" (citing *Gen.*
*Contractors*)), *vacated on other grounds in subsequent determination*, 20 F.4th 1385 (11th Cir.
2021). Here, likewise, Plaintiffs' reliance on *Elrod* (and progeny) is baseless—Plaintiffs do not
assert any First Amendment claims in their complaint or motion, let alone free speech or right of
privacy. *See* Compl. – Counts I and II (¶¶ 149-160).

Second, Plaintiffs argue that "EAC's sovereign immunity against money damages makes
Plaintiffs' pocketbook injuries irreparable harm." Br. 17. But as an initial matter, Plaintiffs do
not seek any monetary relief in this case. *See* Compl. – Prayer for Relief. Their stated goal
rather is to foster "election integrity." Br. 1.

Of course, "[m]ere injuries, however substantial, in terms of money, time and energy
necessarily expended in the absence of a stay, are not enough" to constitute irreparable harm.
*Gen. Contractors*, 896 F.2d at 1285 (citation omitted). And Plaintiffs do not claim, let alone
show, that they have suffered or will suffer any *actual* pecuniary harm. Rather, "Plaintiffs'
pocketbook injuries," Br. 17, are just two hypothetical cost-savings. Plaintiffs hypothesize that
"the relief requested would save the entity plaintiffs money" in two ways: (1) it potentially
would save the $250 filing fee for a subsequent, hypothetical administrative petition with the
Georgia Secretary of State, and (2) "the two political party plaintiffs would save money that they
otherwise would spend in their election efforts." Br. 13.

Neither suffices. Rather, these hypotheticals about money the entity plaintiffs "*would*"
potentially save is impermissibly speculative; indeed, the notion that hypothetical vacatur of the
Suite 5.5-A certification would save the two GOP parties money in future election efforts is
paradigmatic speculation and conjecture. To satisfy the irreparable injury requirement, "[t]he
injury must be neither remote nor speculative, but actual and imminent." *Gen. Contractors*, 896

F.2d at 1285 (quotation omitted);  *see also Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir.1994) (In order to obtain injunctive relief, "a plaintiff must show a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury.").

And in any event, the $250 fee clearly is not a "great" injury.  "For an injury to be irreparable it must be both certain and great, not merely serious or substantial."  *Georgia v. United States*, 398 F. Supp. 3d 1330, 1334 (S.D. Ga. 2019) (Wood, J.) (citation modified).  And the two political party plaintiffs also fail to provide any specific about the magnitude of the alleged hypothetical savings on "election efforts."  *See* Br. 13.  The assertion is entirely unexplained, much less established.  *See Alonso Cano v. 245 C & C, LLC,* No. 19-21826-CIV, 2020 WL 7872626, at *5  (S.D. Fla. Dec. 15, 2020) ("[S]elf-serving assertions unsupported by concrete facts are insufficient to establish irreparable harm.") (quotation omitted) *report and recommendation adopted,* 2020 WL 7770396 (S.D. Fla. Dec. 30, 2020).

Third, the Motion asserts that "Plaintiffs' reputational injuries would qualify as irreparable harm."  Br. 17.  But Plaintiffs claim that *third parties,* not before the court, are the source of the alleged reputational harm:  "[D]ominant legacy media disparage election-integrity efforts by groups like DeKalb GOP and Chatham GOP." Br. 7, ¶ 23*; see also* Decl. of Kendra M. Foltz Biegalski ("Biegalski Decl.") ¶ 18, ECF No. 29-3; Decl. of Garland Favorito ("Favorito Decl.") ¶¶  22, 30, ECF No. 29-4  Any notion that the sought injunction against EAC certification would put an end to this alleged disparagement by these third parties is purely conjecture.  Tellingly, Mr. Favorito's declaration states that "vacating EAC's certification of . . . Suite 5.5-A would be *useful* both to me personally and to VoterGA in defending our reputations . . . ." Favorito Decl. ¶ 31 (emphasis added).  But to succeed on a motion for preliminary injunction, a movant must show "that the preliminary injunction is *necessary* to prevent

irreparable injury" (among the other requirements).  *Chavez v. Florida SP Warden*, 742 F.3d

1267, 1271 (11th Cir. 2014) (emphasis added).  Plaintiffs fail to supply any evidence to support

their conjecture that "[a] judgment compelling EAC to vacate . . . Suite 5.5-A's certification

would prospectively prevent further reputational harm to Plaintiffs," Br. 14. Plaintiffs bear the

burden of providing evidence here:  "Plaintiffs' lack of evidence precludes a finding of

irreparable harm because it is the plaintiff who bears the burden to show a significant threat of

irreparable harm, and a plaintiff cannot merely rely on remote or speculative injuries."  *Brown*,

497 F. Supp. 3d at 1296.

And even if Plaintiffs could establish this, Plaintiffs have been the object of

"disparagement" by the media for years, according to their own Complaint.  *See* Compl. ¶¶ 35,

36 (alleging disparagement since 2020 or 2021).  Plaintiffs do not even claim that they have a

need for urgent, emergency relief now.  "[T]he very idea of a preliminary injunction is premised

on the need for speedy and urgent action to protect a plaintiff's rights before a case can be

resolved on its merits." *Wreal*, 840 F.3d at 1248;  *Siegel*, 234 F.3d at 1177 ("Even assuming

Plaintiffs can assert some kind of injury, they have not shown the kind of serious and *immediate*

injury that demands the extraordinary relief of a preliminary injunction.") (emphasis added).

Indeed, as the Motion itself acknowledges, Plaintiffs are seeking a preliminary injunction

years after they allegedly became aware of purported flaws in Suite 5.5-A.  *See* Br. 19-20.  That,

again, counsels against any finding of irreparable injury.  *See Wreal*, 840 F.3d at 1248 ("A delay

in seeking a preliminary injunction of even only a few months—though not necessarily fatal—

militates against a finding of irreparable harm.");  *S&S Ventures, LLC v. Southland Wood

Recycling, LLC*, No. 7:22-CV-00090, 2022 WL 17828313, *2 (M.D. GA. Dec. 7, 2022) (Sands,

S.J.) (denying preliminary injunction because of, among other reasons, delay of more than three months from commencing the action before moving for a preliminary injunction).

## II.    Plaintiffs are Unlikely to Succeed on the Merits of their Claims.

### A.    Plaintiffs cannot clearly show standing.

"To determine whether Plaintiff has a likelihood of success on the merits, the Court must first determine whether it has jurisdiction over Plaintiff's claims" —including standing. *Donjon-SMIT*, 449 F. Supp. 3d at 1358. As explained below, Plaintiffs' lack of standing is dispositive.

To establish Article III standing, a plaintiff must show (1) that he has "suffered an 'injury in fact' . . . which is '(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations omitted). "Standing is not dispensed in gross," *Davis v. FEC*, 554 U.S. 724, 734 (2008) (brackets omitted) (citation omitted), and Plaintiffs must demonstrate it for each claim they press and for each form of relief they seek, *id*. "Standing is a jurisdictional inquiry, and each plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing that he has standing to sue." *Id*. As explained below, none of Plaintiffs' various underlying theories of standing hold up.

### 1.    Plaintiffs' "vote dilution" theory does not support standing here.

Plaintiffs' primary premise for standing is "vote dilution," *see* Br. ¶ 19, but courts resoundingly reject that theory for failure to support a "particularized" and "concrete" injury, where, as here, they are suing as voters, and not candidates. As the Eleventh Circuit explained in *Wood v. Raffensperger*, "vote dilution"—where, as alleged in this case, no single voter is specifically disadvantaged—is a "paradigmatic *generalized* grievance that cannot support standing." 981 F.3d 1307, 1314-15 (11th Cir. 2020) (emphasis added), *cert. denied*, 141 S. Ct.

1379 (2021).  Generally, "plaintiffs alleging election law violations lack standing to sue unless they can show they suffered or will suffer an injury that impacts them more than the general public." *Graeff*, 2023 WL 2424267, at *5  Rather, a claimant of vote dilution requires a "point of comparison." *Wood*, 981 F.3d at 1314.  "For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." *Id*. (citation omitted).  "In other words, standing to sue requires the plaintiffs to show that they are disadvantaged in a *different way* than every other voter." *Testerman v. NH Sec'y of State*, No. 23-CV-499-JL-AJ, 2024 WL 1482751, at *4 (D.N.H. Jan. 9, 2024) (quotation omitted) (emphasis added), *aff'd sub nom. Briggs v. Scanlan*, No. 24-1316, 2024 WL 5505862 (1st Cir. Oct. 15, 2024).  "By contrast, no single voter is specifically disadvantaged if a vote is counted improperly, even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote." *Wood*, 981 F.3d at 1314 (quotations omitted).  Plaintiffs allege no point of comparison here.

Recently, in *United Sovereign Americans., Inc. v. Raffensperger*, No. 2:24-cv-104, 2025 WL 1266941, at *6 (S.D. Ga. May 1, 2025) (Wood, J.) the court applied *Wood* to reject a similar "vote dilution" theory,  concluding that petitioners failed to assert a particularized and concrete injury where they claimed that "the state of Georgia caused their asserted injury by 'diminish[ing] the effectiveness of their vote'"  (based on, among other things, allegedly uncertified electronic voting systems)— because that claimed "*injury affects the Petitioners as voters indistinguishably from the way it affects all Georgia voters*."  (alteration in original) (emphasis added) (citation omitted).  The court explained, "For the Petitioners asserting an injury based only on their status as Georgia voters, this case is decided by *Wood*," where "the Eleventh Circuit … stated with crystalline clarity, this vote dilution theory only provides a basis for

standing when there is 'a point of comparison'"—that is, "when that person alleges facts showing a unique or differentiated disadvantage to *themselves as individuals*." *Id*. at *4, 6 (citation omitted) (and adding "that courts around the country have rejected [this vote dilution] theory of standing.").[6]

"What is more, even if [plaintiffs] could somehow demonstrate that they suffered a concrete, particularized harm stemming from past vote dilution, petitioners do not plausibly allege, much less show, that the same irregularities are 'certainly impending' to occur in future elections—in other words, imminent." *United Sovereign Ams., Inc. v. Benson,* No. 24-CV-12256, 2025 WL 1285806, at *4 (E.D. Mich. May 2, 2025) (citation omitted).  And this theory likewise relies upon an impermissibly speculative chain of contingencies.  *See Mussi*, 2024 WL 4988589, at *5.  Here, the declarations purporting to support the dilution theory are rife with assertions about "possible future injury," rather than supporting injuries that are "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013) (citation modified).  *See* Decl. of Richard J Armstrong ("Armstrong Decl.") ¶ 14, ECF No. 29-5 ("If Georgia continues to use . . . Suite 5.5-A in elections, I am concerned not only that Georgia will not accurately count my vote, but also

---

[6] *See also, e.g., O'Rourke v. Dominion Voting Sys., Inc.*, No. 21-1161, 2022 WL 1699425, at *2 (10th Cir. May 27, 2022) (plaintiffs "lack standing to pursue this litigation unless they identify an injury to themselves that is distinct or different from the alleged injury to other registered voters."); *Mussi v. Fontes*, No. CV-24-01310, 2024 WL 4988589, at *6 (D. Az. Dec. 5, 2024) (vote dilution does not support standing because "it is an injury felt equally by *every* voter"); *Pirtle v. Nago*, No. CV 22-00381 JMS-WRP, 2022 WL 17082168, at *1, 3 (D. Haw. Nov. 18, 2022) (concluding that plaintiff failed to establish standing for allegation that electronic voting machines used in Hawaii are plagued by a "Trapdoor" cryptographic security risk, because "[a]s the Eleventh Circuit reasoned [in *Wood*], a voter who bases his standing on his interest in ensuring that only lawful ballots are counted, asserts only a generalized grievance"); *Testerman*, 2024 WL 1482751, at *5 (observing "overwhelming weight of election-related caselaw" forecloses vote dilution theory).

that third parties *may* dilute my vote with unlawful votes." (emphasis added)); Favorito Decl. ¶ 38 (identical); Biegalski Decl. ¶ 15 (identical), ¶ 26.

And contrary to Plaintiffs' contention, Br. 15-16, "the Supreme Court made clear that past occurrences of unlawful conduct do *not* establish standing to enjoin the threat of future unlawful conduct." *See City of S. Miami v. Governor*, 65 F.4th 631, 637 (11th Cir. 2023) (emphasis added) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)). In any event, Plaintiffs' declarations fail to establish the existence of past occurrences. *See, e.g.,* Armstrong Decl. ¶ 13 ("I am concerned that . . . past anomalies . . . indicate that malicious actors *may* have exploited [Suite 5.5-A's] cybersecurity vulnerabilities" (emphasis added). Biegalski Decl., ¶ 14 (similar).

Even if the vote dilution injury were cognizable, causation and redress are also defective, where Plaintiffs have brought this lawsuit against *EAC*, but are "seeking to end *Georgia's* use of . . . Suite 5.5-A." *See* Br. 13 (emphasis added). Plaintiffs do not show that *EAC* is the cause of their claimed injury: according to their own papers, it is *Georgia's* chosen use of Suite 5.5-A. In other words, EAC did not require Georgia to use Suite 5.5-A—Georgia voluntarily chose to utilize the EAC-certified system. *See* 52 U.S.C. § 20971(a)(2) ("*At the option of a State*, the State may provide for the testing, certification, decertification, or recertification of its voting system hardware and software by the laboratories accredited by the Commission under this section." (emphasis added)). *See DeKalb Cnty.*, 921 S.E. 2d at 23-27 (discussed *supra*). Nor would the relief sought redress Plaintiffs' alleged injury. As explained above, in the preceding state court litigation, the trial court concluded that "according to the plain language" of OCGA § 21-2-300(a), the Geogia Secretary of State "had only a *one-time*, temporal duty to ensure EAC certification," prior to (as relevant here) the acquisition of Suite 5.5-A, *"*and a similar *one-time* duty" to certify that system as safe for use in advance elections—rather than "an ongoing duty."

*See id.* at 26 (emphasis added). Plaintiffs' own declarations acknowledge this: they rely upon a "hope" as to what third-party Georgia would do. *See* Armstrong Decl. ¶ 16 ("If . . . this Court issues a finding that . . . Suite 5.5-A does not meet [EAC's] certification standards, I would *hope* that the Georgia Secretary of State would use that Office's authority [under O.C.G.A. § 21-2-324(a)] to reexamine its certification that . . . Suite 5.5-A is safe for use in Georgia elections.") (emphasis added); Favorito Decl. ¶ 34 (same); *see also* Br. 18 ("Georgia would be free to determine for itself how to proceed if the EAC certification on which it relied was deficient.")

Plaintiffs brush these elements of Article III standing aside. They assert that "causation and redressability pose 'little question' when the government directly regulates a plaintiff," but they do not even attempt to show how this would apply here, since the EAC is not regulating them. *See* Br. 10 (citation omitted). Likewise, they assert that "[n]either immediacy nor redressability pose a barrier" because EAC's "denial inflicted procedural injury, which . . . lowers the article III threshold for immediacy and redressability." *Id*. at 15 (emphasis omitted). But "[t]o show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." *Lowman v. FAA*, 83 F.4th 1345, 1355 (11th Cir. 2023) (citation omitted). Plaintiffs fail to explain how this would apply. "[T]his is not a procedural rights case" in the first place, *see United Sovereign Ams.*, 2025 WL 1266941, at *4 n.8, and in any event, "[d]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 781 F.3d 1271, 1280 (11th Cir. 2015) (citation omitted).

Finally, candidates for political office—in contrast to the individual Plaintiffs here, who sue as voters—do have standing, specifically, as the Supreme Court just announced, "to challenge the rules that govern the counting of votes in his election." *Bost v. Ill. State Bd. of Elections*, 607 U.S. ---, No. 24-568, 2026 WL 96707, at *6 (2026). "Voters," the Court explained, "have a general interest in an accurate vote tally." *Id*. at *1. "But a candidate's interest differs in kind." *Id*. at *3. The Court explained:

> [A] candidate has a personal stake in the rules that govern the counting of votes in his election. . . . . Win or lose, candidates suffer when the process departs from the law. . . . Such harm to candidates is in no sense "common to all members of the public." . . . What matters is that the harm candidates suffer is distinct from that suffered by the "people generally." Those who spend untold time and resources seeking to claim the right to voice the will of the people have "an undeniably different—and more particularized—interest" in knowing what that will is.

*Id*. (citations omitted). Thus, the Court held that a candidate for office need not show extra costs incurred, a probability of winning, or similar evidence, to maintain standing to sue. *See id.* at *5-6. Rather, the Court held that Mr. Bost had standing to challenge Illinois's rules requiring the counting of mail-in ballots received after election day, precisely because of his candidacy in that election. *Id*. at *2, 6. Notably the Court limited its holding to just that: "we address today *only* candidates' standing to challenge rules that, like Illinois's, govern the counting of votes in their elections." *Id*. at *5 n.7 (emphasis added). The decision therefore does not change the result in this case, because Plaintiffs are not candidates "challeng[ing] the rules that govern the counting of votes." *See id.* at *6.

### 2. Plaintiffs' other standing theories are also meritless.

***Informational standing***: Plaintiffs' "informational standing" argument, Br. 13, is devoid of any authority, and presumably Plaintiffs attempt to rely on the line of cases in which "a plaintiff has standing because she seeks to enforce a statutory disclosure requirement." *See*

*Lambe v. Allgate Fin., LLC*, No. 16-CV-24407, 2017 WL 3115755, at *2 (S.D. Fl. July 20, 2017) (discussing line of cases).  For an informational injury, "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Comm'n v. Akin*s, 524 U.S. 11, 21 (1998) (citation omitted).  Indeed, "statutes like FOIA and FACA [(the Federal Advisory Committee Act)] that have served as the basis for informational standing have a goal of providing information to the public." *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010); *see also generally, Maryland v USDA*, 151 F.4th 197, 208 (4th Cir. 2025) (referring to "a quintessential informational injury—the federal government withheld information that the States had a statutory right to receive.").  These cases do not apply.  The Favorito and Biegalski declarations both refer to "the information that 52 U.S.C. § 20922(2) requires EAC to provide," Biegalski Decl. ¶ 23, Favorito Decl., ¶ 30, but Plaintiffs provide no basis to conclude that this statute imposes any disclosure requirement that could be the source of any injury here.[7]  Nothing in that statute requires the disclosure of information, the denial of which would cause a harm which Congress sought to prevent by requiring disclosures.  *See generally, Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).  And as Plaintiffs acknowledge, EAC already responded to Plaintiffs' Petition to Vacate. *See supra*.  They do not like that response, but that is a substantive objection, not a lack of information required to be disclosed under that statute.

"***Pocketbook standing***":  As noted above, Plaintiffs' "pocketbook injury " theory is predicated on two forms of hypothetical costs *savings*—not actual financial injury (the

---

[7] That statute simply states: "The [EAC] shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by . . . carrying out the duties described . . . relating to the testing, certification, decertification, and recertification of voting system hardware and software."  52 U.S.C. § 20922(2).

hypothetical $250 administrative petition fee, and political parties' hypothetical savings in their "election efforts.")  *See* Br. 13.  As an initial matter, their argument that these speculative cost-savings constitute a "classic pocketbook injury" turns the label on its head.  *Id.* (citation omitted). "'[A] classic pocketbook injury' is both concrete and tangible." *Garza v. Woods*, 150 F.4th 1118, 1124 (9th Cir. 2025) (*quoting Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023); *see also, Tyler,* 598 U.S. at 636 (holding that the plaintiff sufficiently alleged an Article III injury when she alleged that a county "illegally appropriated [a] $25,000 surplus" in a tax sale of her real property).[8]  In any event, Plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 402; *see Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (an organization "cannot spend its way into standing.").  In fact, as noted above, the Supreme Court reconfirmed this in *Bost*, 2026 WL 96707, at *16 (Jackson,  J., dissenting) (observing that "the majority correctly rejects . . .  pocketbook-injury theory analysis due to its speculative nature," as basis of standing for political candidate to challenge the rules governing the votes in his election).

---

[8] Other examples of "classic pocketbook injury" included, *e.g.*, *Hendershot v. Stanton*, 162 F.4th 625, 628 (6th Cir. 2025) (Plaintiffs' "complaint . . . alleges a classic pocketbook injury caused by the defendants and redressable by the requested relief," where she claimed that "any interest Michigan earned from her accounts was rightfully hers, and she enlists [the court's] help to get it back"); *Marrow v E.R. Carpenter Co.,* No. 8:23-cv-2959, 2025 WL 385570, *4 (M.D. Fla. Feb. 4, 2025) (complaint "alleged pocketbook injury" where plaintiff alleges that because of insufficient COBRA notice, she lost insurance and her medical expenses increase); *Jama v. State Farm Mut. Auto. Ins. Co.*, 113 F.4th 924, 937 (9th Cir. 2024) (finding insurance company's application of a "negotiation adjustment" that lowered the dollar amount plaintiffs received was "a classic pocketbook injury sufficient to give a plaintiff standing" (citation modified)); *SOL-MM III LLC v. JPMorgan Chase Bank, N.A.*, No. 23-cv-6479, 2025 WL 936414, at *9 (S.D.N.Y. Mar. 27, 2025) ("classic pocketbook injury" where transaction allegedly made repayment of a loan impossible), *partial reconsideration on other grounds*, 2025 WL 1295467 (S.D.N.Y. May 5, 2025).

***Reputational standing***:  As explained above, Plaintiffs reputational injury theory is that *third parties,* not before the court, have disparaged them.  Br. 13  But Plaintiffs must "show that defendants caused his reputational injury and that this Court can redress it by granting the relief he requests."  *See, e.g., Rangel v. Boehner*, 20 F. Supp. 3d. 148, 160 (D.D.C. 2013), *aff'd*, 785 F.3d 19 (D.C. Cir. 2015).  Plaintiffs appear to claim that they have established causation because "the premise underlying the reputational attacks on Plaintiffs is EAC's imprimatur over . . . Suite 5.5-A's safety," Br. 14, but they cite no evidence to show that—nor any authority to support their theory.  As already explained above, Plaintiffs also fail to show that any relief would provide redress: the declarations just claim that relief would be "*useful*" for "defending . . . reputations." *See* Favorito Decl. ¶¶ 30, 31; Biegalski Decl. ¶ 23. At best, this argument is entirely speculative.

### 3.    None of the plaintiffs have standing.

With this backdrop, it is clear that neither the individual plaintiffs nor the organizational plaintiffs establish standing.

### a.  Individual plaintiffs

The two individual plaintiffs, Messrs. Armstrong and Favorito, both lack standing. Identifying themselves as Georgia voters (not as candidates in an election), both rely on vote dilution, which as already explained above, is not a cognizable injury and does not support standing.  The declaration of Mr. Armstrong (who also identifies himself as a VoterGA member) reveals that he asserts no injury apart from voter dilution.  *See* Armstrong Decl. ¶ 14.  Mr. Favorito (who identifies himself as VoterGA's co-founder), alleges, in addition to vote dilution, only "reputation and information" injuries, which as explained above, are meritless.  *See* Favorito Decl. ¶¶ 22, 28, 30, 38.

### b.  Organizational Plaintiffs

"An organization can establish Article III standing either through its members or through its own injury in fact."  *City of S. Miami*, 65 F.4th at 636-37 (cleaned up) (citation omitted). Neither theory supports standing here for any of the three organizational plaintiffs.

### (i)    Associational Standing

An organization has associational standing "when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (citation omitted).  Plaintiffs fail at the first step as they do not identify any individual member with standing in his own right.  Thus, VoterGA cannot show associational standing, because its sole identified member is Mr. Armstrong (who lacks standing, as explained above).[9]  Chatham GOP identifies no members—no declaration even has been submitted on its behalf.  And DeKalb GOP lacks associational standing because Ms. Biegalski, a member and the Chair, lacks standing in her own right.

Specifically, the declaration of Ms. Biegalski reveals that she merely asserts her own injuries based on fear of vote dilution, and "reputational and informational injury,"—none of which support standing, for the reasons explained above. *See* Biegalski Decl. ¶¶ 14-16, 23-24. Finally, Ms. Biegalski's declaration does not salvage associational standing by referring to another member of DeKalb GOP, "Darius Francis, who plans to run for Georgia House District 115 in the 2026 election when candidate qualification begins in March of 2026."  *Id*. ¶ 31.  This

---

[9] Mr. Favorito does not state he is a member of VoterGA (rather, he states that he is co-founder). *See* Favorito Decl. ¶ 2.  But even if he were a member, he fails to establish standing for the reasons described above.

passing reference to what this member apparently "*plans,*" does not, without more, supply standing.  "An organization asserting associational standing must 'make *specific* allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'"  *Ala. State Conf. of the NAACP v. Allen*, 796 F. Supp. 3d 759, 887 (N.D. Ala. 2025) (alterations in original) (citation omitted), *appeal filed*, No. 25-13007 (11th Cir. Sep. 2, 2025).  And the Supreme Court's recent decision in *Bost*, 2026 WL 96707, at *5 n.7 does not extend to this individual, since that decision simply held that "[c]andidates have a concrete and particularized interest in the rules that govern the counting of votes in their elections," *i.e.,* the rules for counting of mail-in ballots. Those rules are not at issue in this case, which concerns EAC certification of a voting machine. In any event, the declaration fails to show that this member "has been harmed" or "face[s] certainly impending harm," where Georgia' primary elections are in May 2026.  *See* Br. 2.

### (ii)    Organizational Standing

An organization may show standing to sue in its own right by satisfying the traditional criteria applicable to individuals—*i.e.,* a cognizable injury in fact, causation, and redressability. This requires a "concrete and demonstrable injury, not an abstract social interest."  *Jacobson v. Fla. Sec'y of State*, 974 F. 3d 1236, 1251 (11th Cir. 2020) (citation omitted).  But as the Supreme Court recently clarified, the notion that "standing exists when an organization diverts its resources in response to a defendant's actions . . . is incorrect." *All. for Hippocratic Med.*, 602 U.S. at 395. Otherwise, "all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies." *Id*.  As noted, an organization cannot "spend its way into standing" in that way. *Id*. at 394.

VoterGA does not clear this bar, because it relies upon the "pocketbook injuries" (including the $250 filing fee) and "reputational and informational injuries" which, as already discussed above, do not support injury. *See* Favorito Decl. ¶¶ 30-31, 36. Mr. Favorito declares that "[t]he false assurance of cybersecurity that EAC's certification lends to . . . 5.5-A is an obstacle to VoterGA's core mission and makes it both more expensive and more difficult for VoterGA to perform that mission and to associate with nonmembers to grow VoterGA's membership." *Id.* at ¶ 32. But any spending associated with this cannot support injury because the "security and integrity of Georgia elections" is VoterGA's very mission. *See id.* ¶ 4. And the declaration merely says that relief from this court "would aid VoterGA in that mission"—not redress an injury. *See id.* ¶ 33.

DeKalb GOP fares no better. Beyond the "reputational and informational injuries," and diversion-of-resource arguments, which as already explained above, do not suffice, the various purported injuries listed in the Biegalski Declaration are all essentially derivations of a *fear* or concern of vote dilution. *See, e.g.,* Biegalski Decl. ¶¶ 26-29. But as one court explained, where, as here, "Plaintiffs' claim of vote dilution is too generalized, too speculative, and premised on too many hypothetical contingencies to qualify as an injury-in-fact," the Supreme Court's decision in *Clapper* precludes "repackaging . . . fear of vote dilution (and attendant loss of confidence in the electoral process) as an independent injury." *Mussi*, 2024 WL 4988589, at *8. And finally, the Motion itself admits that the Eleventh Circuit has not recognized any distinct interest of political parties in election integrity for standing purposes. Br. 14.

Chatham GOP was not even a party to the Petition to Vacate (at the time it was filed), and Plaintiffs provides no grounds as to why it should have standing to challenge EAC's Response.

In any event, as noted, no declaration or other evidence has been provided on behalf of Chatham GOP.

**B.    Plaintiffs' APA claims fail on the merits.**

Even if Plaintiffs could establish jurisdiction, they fail to "clearly" show a "substantial likelihood of success" on their two asserted APA claims.  *See* Compl., Counts I and II.  Plaintiffs dedicate about one page for their "likely to prevail on the merits"-argument (*see* Br. pp. 16-17, cross-referencing to pp.  23-24).  According to that argument, "EAC's allowing . . . Suite 5.5-A's certification to remain extant is 'arbitrary, capricious, and an abuse of discretion' . . . ."  Br. 24 (brackets omitted) (citation omitted).  But Plaintiffs mistake the standard of review under the APA.

As the Eleventh Circuit has explained, "This [arbitrary and capricious] standard of review is 'exceedingly deferential' and provides the reviewing court with limited discretion to reverse an agency's decision.  The reviewing court may not substitute its own judgment for that of the agency but must, instead, generally defer to the agency's technical expertise."  *City of North Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1266 (11th Cir. 2022) (citation omitted).  Even "a decision of less than ideal clarity" will be upheld so long as "the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Ark.-Best Freight System, Inc.*, 419 US 281, 286 (1974).  Put differently, the agency need only "a 'rational connection between the facts found and the choice made,'" *id*. at 285 (citation omitted), acting within a wide "zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Here, EAC squarely followed the procedures set forth in the VSTC Program Manual in responding to Plaintiffs' Petition to Vacate.  Those procedures explicitly set out a multi-tiered process for a decertification request, starting with initiation of an informal inquiry, to determine

if the reported information is accurate, and leading to a more formal finding, where the manufacturer would have notice and an opportunity to respond. Pursuant to those procedures (described *supra*), EAC responded that it was commencing an informal inquiry based on the evidence presented.  AR-765-66.  Contrary to allegations in the complaint, EAC did not deny the petition—rather, it denied only the relief requested (recission of EAC's certification of Suite 5.5-A, or forwarding the effective date to 2027), citing the procedures set forth in the VSTC Program Manual (a manual Plaintiffs do not challenge).  *See id.*  EAC's Response Letter explained that granting any of this requested relief would require that EAC take arbitrary agency action (which could have the effect of hindering the rights of a manufacturer), and also, that "[f]orward dating a prior grant of certification has no foundation in law or policy."  *Id*. at 766.

Plaintiffs seem to emphasize that EAC took action, "without disputing the merits," Br. 24, but again, one of the actions EAC took was the initiation of an informal inquiry into the merits.  In other words, the merits are currently under review. *C.f., Sterigenics U.S., LLC v. Cobb County*, No. 1:20-cv-1382, 2023 WL 11911003, at *10–14 (N.D. Ga. Feb. 16, 2023) (Geraghty, J.) (relying on prudential ripeness grounds doctrine). Plaintiffs also argue that the VSTC Program Manual is silent on how non-manufacturers may seek EAC review.  Br. 22-23.  But the Manual's provisions on informal inquiry do not differentiate based on the source of the information or complaint.  In fact, the Manual states:  "Informal inquiries are initiated at the discretion of the Program Director. They may be initiated any time the Program Director receives *attributable, relevant information that suggests a certified voting system may require decertification.  The* information must come from a source that has used, tested, or observed the reported occurrence." VSTC Manual § 7.2.1.1 (Initiation) (AR-813) (emphasis added).  The Manual even provides examples of informal inquiries arising from information provided by non-manufacturers.  *See*

VSTC Manual § 7.2.1.2 (Inquiry) (AR-814) ("[I]nformation provided by *election officials or by voters* who have used a voting system may require the Program Director (or assigned EAC staff) to perform an in-person inspection or make inquiries of the manufacturer." (emphasis added)). Thus, regardless of the source, the agency (per these procedures) moves to an informal inquiry, and then (based on the findings), to a formal investigation. The November 18 Response Letter (AR-765-66) and the steps taken to date are consistent with this and manifest this process.

## III.   The Equities Weigh Against a Preliminary Injunction.

As explained above, EAC has an active, informal inquiry underway, which EAC initiated in response to the Petition to Vacate, pursuant to the procedures in the VSTC Program Manual. Plaintiffs do not dispute that this process is underway. The Court should allow this process to proceed uninterrupted.

Plaintiffs contest this largely relying on rhetoric and innuendo. *See* Br. 19 ("EAC's proposed delay here demonstrates an agency that is either incompetent or else hopelessly captured by the industry it purports to regulate."); ("EAC's imprimatur of perceived competence should not support continued use of . . . Suite 5.5-A...."). Plaintiffs are silent about the potential confusion or chaos that could ensue among state and local government if the Court were to grant any of Plaintiffs' requested relief—particularly in light of the nationwide character of the relief sought. The EAC's interest is in ensuring election integrity and complying with the law, including adherence to applicable procedures and affording appropriate procedural protections, and reaching the right outcome on a substantive record.

## IV.   Remedy

In the event that the Court disagrees with Defendants and determines that the November 18 EAC Response is unlawful, the Court should vacate that decision and remand to EAC. *See Georgia v. Brooks-LaSure*, No. 2:22-cv-6, 2022 WL 3581859, at *20 (S.D. Ga. Aug. 19, 2022)

(Wood, J.) ("The APA commands, with refreshing clarity, that courts '*shall* hold unlawful and set aside agency action' that is 'arbitrary, capricious . . . or otherwise not in accordance with law.'") (omission in original) (quoting 5 U.S.C. § 706(2)) (emphasis in quotation).  Plaintiffs provide no authority for their request that the Court vacate EAC's certification of Suite 5.5-A *ab initio*, or re-write the effective date of the certification.  *See Adams v. Bordeau Metals Se., LLC,* No. 24-11572, 2025 WL 1122444, at *5 (11th Cir. Apr. 15, 2025) ("Any injunction that is 'more burdensome' than is necessary to provide complete relief is impermissibly broad." (citation omitted)).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Corrected Emergency Motion for Interim and Merits Relief.

Dated: February 5, 2026                Respectfully submitted,

DAVID H. ESTES
Attorney for the United States
Under Authority Conferred by 28 U.S.C. § 515
*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia  31412
Telephone:  (912) 652-4422
E-mail: Woelke.Leithart@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH E. BORSON
Assistant Director
Federal Programs Branch

*/s/ Steven M. Chasin*
Steven M. Chasin (D.C. Bar# 495853)
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.;
Washington, DC 20005
Tel: (202) 305-0747
Email: steven.m.chasin2@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I, Steven M. Chasin, hereby certify that a copy of the of the foregoing was electronically filed with the Clerk of the Court using CM/ECF and served upon all counsel of record by Notices of Electronic Filing generated by CM/ECF on February 5, 2026.

*/s/ Steven M. Chasin*