**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

VOTERS ORGANIZED FOR TRUSTED
ELECTION RESULTS IN GEORGIA;
DEKALB COUNTY REBUBLICAN PARTY,
INC.; CHATHAM COUNTY REPUBLICAN
PARTY, INC.; GARLAND FAVORITO; and
RICHARD J. ARMSTRONG,

        Plaintiffs,

        v.

ELECTION ASSISTANCE COMMISSION;
UNITED STATES; and BRIANNA
SCHLETZ, DONALD L. PALMER,
THOMAS HICKS, CHRISTY MCCORMICK,
BENJAMIN W. HOVLAND, each in their
Official Capacities,

        Defendants.

CIVIL ACTION NO.: 4:25-cv-316

**O R D E R**

Plaintiffs Voters Organized for Trusted Election Results in Georgia ("VoterGA"), DeKalb County Republican Party, Inc. ("DeKalb GOP"), Chatham County Republican Party, Inc. ("Chatham GOP"), Garland Favorito, and Richard J. Armstrong brought this action against the Election Assistance Commission ("EAC"), the EAC's Executive Directors and Commissioners, Brianna Schletz, Donald L. Palmer, Thomas Hicks, Christy McCormick, and Benjamin W. Hovland, and the United States, seeking declaratory and injunctive relief under the Administrative Procedure Act, 5 U.S.C. § 551, *et. seq.*, ("APA"), the Help America Vote Act of 2002, 52 U.S.C. § 20901, *et. seq.*, ("HAVA"), and the Due Process Clause, U.S. CONST. amend. V, cl. 4. (Doc. 1.) Before the Court is Plaintiffs' Corrected Emergency Motion for Interim and Merits Relief. (Doc. 29.)

For the reasons explained below, this Court lacks subject matter jurisdiction because none of the Plaintiffs have standing. Accordingly, the Court **DISMISSES** Plaintiffs' Complaint and **DIRECTS** the Clerk of Court to **CLOSE** this case.[1]

## BACKGROUND

HAVA established the EAC and charged it to "provide for the testing, certification, decertification, and recertification of voting system hardware and software by accredited laboratories." 52 U.S.C. § 20971(a)(1). In response to this requirement, the EAC developed the Voting System Testing and Certification Program. The Program's procedural requirements are set forth in the EAC Voting System Testing and Certification Manual (the "VSTC Manual"). (Doc. 29-2, pp. 768–846 (Version 3.0 effective November 15, 2022).) Under this framework, the EAC certified Suite 5.5-A—a paper-based optical scan voting system—on January 30, 2019. (See doc. 1, p. 29.) The State of Georgia soon after purchased and certified Suite 5.5-A for use in its elections.[2] (See id.)

---

[1] The Court **GRANTS** Plaintiffs' Motion for Judicial Notice in Support of Motion for Interim and Merits Relief. (Doc. 39.) The Court has considered the exhibits attached to that Motion when determining whether Plaintiffs have standing. The Court **DENIES AS MOOT** Plaintiffs' Emergency Motion to Compel Defendants to File the Administrative Record. (Doc. 49.) Particularly given the extensive arguments the parties have provided, the Court can determine whether Plaintiffs have standing without reviewing the administrative record, and, because the Court cannot proceed to the merits of Plaintiffs' claims, the Court does not need the administrative record. The Court lacks jurisdiction to consider all other pending motions, and the Court **DIRECTS** the Clerk of Court to **TERMINATE** those motions.

[2] In 2019, the State of Georgia, pursuant to statute, moved from conducting elections using a "direct recording electronic" voting system to a uniform voting system that produced paper ballots marked by an electronic ballot marking device, which would display voters' choices in a format readable by voters, and that would be scanned and tabulated by ballot scanners. As part of the transition, the General Assembly imposed, in relevant part, two statutory requirements for the selection of the new voting system. Specifically, under the newly-revised O.C.G.A. § 21-2-300(a)(3), any new voting system consisting of electronic ballot markers and ballot scanners was required to be "certified by the [EAC] prior to purchase, lease, or acquisition" by the State. See O.C.G.A. § 21-2-300(a)(3). Additionally, under O.C.G.A. § 21-2-300(a)(2), the Secretary of State was to certify the voting system as "safe and practicable for use," before it was to be deployed for use in all federal, state, and county elections within the State. See OCGA § 21-2-300(a)(2).

2

In August 2024, DeKalb GOP was advised that Suite 5.5-A relies upon a hard-coded administrative password and stored encryption keys in plain text. (Id. at pp. 29–30.) DeKalb GOP subsequently petitioned the Superior Court of Fulton County ("the Fulton County Litigation") for a writ of mandamus to Georgia's Secretary of State. (Id. at p. 30.) That petition challenged Georgia's use of Suite 5.5-A on the basis that Suite 5.5-A did not meet EAC certification requirements. (Id.) The Fulton County Superior Court dismissed DeKalb GOP's application, finding that Georgia law only imposed a one-time requirement for Georgia's election systems to be certified by the EAC (specifically, they must meet certification requirements "prior to purchase"); once a system was certified, there was no "continuing duty" under Georgia law of ensuring the system's "ongoing compliance" with the certification requirements. DeKalb Cnty. Republican Party v. Raffensperger, No. 24-CV-011028, 2024 WL 4605153, at *3–4 (Ga. Super. Ct. Oct. 4, 2024) ("There is no clear legal right to the Applicant's demanded relief."). DeKalb GOP appealed, and the Georgia Court of Appeals affirmed the dismissal for lack of standing. DeKalb Cnty. Republican Party, Inc. v. Raffensperger, 921 S.E.2d 23, 33 (Ga. App. Ct. 2025).

On October 30, 2025, Plaintiffs (without Chatham GOP) filed an amended administrative petition with the EAC's Executive Director and Commissioners seeking merits and interim relief with respect to the EAC's certification of Suite 5.5-A. (Doc. 1, pp. 35–36.) On November 18, 2025, the EAC's General Counsel denied both forms of merits review and interim relief and instead indicated that the EAC would commence a review pursuant to the VSTC Manual. (Id. at p. 36.) On November 24, 2025, Plaintiffs (then joined by Chatham GOP) responded to the EAC's bases for denial and requested interim relief. (Id.) On November 28, 2025, the EAC's General Counsel replied that the EAC would continue the process outlined in the November 18 denial letter and denied interim relief. (Id.)

On December 22, 2025, Plaintiffs filed this lawsuit, seeking interim and merits relief under the APA, "first to postpone the effective date of—and ultimately to vacate—EAC's certification" of Suite 5.5-A based on the voting system's "glaring cybersecurity flaws that Plaintiffs raised by administrative petition pursuant to 5 U.S.C. § 555(b) on October 24, 2025, that EAC unlawfully denied by letter dated November 18, 2025, and email dated November 28, 2025."  (Id. at p. 3.) Plaintiffs argue that Defendants' actions violated the APA procedurally and violated HAVA substantively.[3]  (Doc. 29, p. 1.)  Plaintiffs filed a Motion for Interim and Merits Relief, (doc. 12), and subsequently filed their Corrected Emergency Motion for Interim and Merits Relief, (doc. 29). Plaintiffs ask the Court to enter a final judgment vacating the EAC's certification of Suite 5.5-A and to issue interim relief to delay the effective date of the EAC's certification of Suite 5.5-A to January 21, 2029.  (Id. at p. 25.)  Defendants filed a Response opposing Plaintiffs' requests for interim and merits relief.  (Doc. 35.)  Defendants argue, among other things, that Plaintiffs do not have standing to pursue any of their claims.  (Id. at pp. 2, 15–27.)  Plaintiffs filed a Reply addressing Defendants' arguments.  (Doc. 38.)  The Court held a telephonic status conference on March 25, 2026.  (See doc. 46.)  At that conference, Plaintiffs generally stated that they did not believe an evidentiary hearing was necessary to resolve the issues that had been thoroughly addressed in the parties' briefs.

## STANDARD OF REVIEW

The Court must first address whether Plaintiffs have standing before addressing the substance of Plaintiffs' claims.  See Corbett v. Transp. Sec. Admin., 930 F.3d 1225, 1232 (11th

---

[3]  "HAVA creates no private cause of action.  Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure.  52 U.S.C. §§ 21111, 21112."  Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019).

Cir. 2019) ("[S]tanding is a threshold question that must be explored at the outset of any case."); Federal Rule of Civil Procedure 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The parties have argued about standing at length, but they have not addressed what standard of review the Court should employ when assessing their arguments. "A district court may dismiss a complaint for lack of subject-matter jurisdiction based on: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint plus undisputed facts plus the court's resolution of disputed facts." Butler v. Morgan, 562 F. App'x 832, 834 (11th Cir. 2014) (citing Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. May 1981)). "[I]n considering whether a plaintiff has standing to bring a claim, the court may consider facts which go beyond the complaint." Cone Corp. v. Hillsborough Cnty., 848 F. Supp. 174, 175 (M.D. Fla. 1994) (citing Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 109 n. 22 (1979)). "To be sure, both [the Eleventh Circuit] and the Supreme Court have determined that in limited circumstances, the absence of notice of the need to prove standing may mandate either the application of a more lenient standard or remand for further development of the record." City of Miami Gardens v. Wells Fargo & Co., 931 F.3d 1274, 1285 (11th Cir. 2019).

Here, the parties have known that standing would be hotly contested from the outset. Plaintiffs included standing arguments in their Complaint, (doc. 1, pp. 5–18), and the parties have addressed standing at length in their pleadings on Plaintiffs' Motion for Interim and Merits Relief, (doc. 29, pp. 10–16; doc. 35, pp. 15–27; doc. 38, pp. 2–14). Additionally, Plaintiffs have supplemented the record through the above-granted Motion for Judicial Notice and through their Emergency Motion for Leave to File Supplemental Declarations, (see doc. 48). Plaintiffs have not argued, at the status conference or otherwise, that they need time to develop additional evidence

to establish standing. On the contrary, Plaintiffs have argued that the Court should advance to consider whether they are entitled to final merits relief under Federal Rule of Civil Procedure 65(a)(2). (Doc. 29, pp. 20–21; doc. 38, pp. 24–25.) Thus, the Court will consider the entirety of the record when assessing whether Plaintiffs have demonstrated standing.[4] That said, "[i]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." Culverhouse v. Paulson & Co. Inc., 813 F.3d 991, 994 (11th Cir. 2016) (quoting City of Waukesha v. EPA, 320 F.3d 228, 235 (D.C. Cir. 2003)).

## DISCUSSION

Article III of the United States Constitution cabins the jurisdiction of the federal courts to the resolution of cases and controversies. U.S. CONST. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). The standing requirement guarantees "that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" FDA v. All. for Hippocratic Med., 602 U.S. 367, 379 (2024) (quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, 454 U.S. 464, 487 (1982)).

"At least one plaintiff must have standing to seek each form of relief requested in the complaint."[5] Town of Chester v. Laroe Estates, Inc., 581 U.S. 433, 439 (2017); see also Wilding

---

[4] The Court examines the full record to be certain that it has afforded Plaintiffs every opportunity to establish standing. If the Court's inquiry were limited to the face of Plaintiffs' Complaint, the Court would even more easily find that Plaintiffs have not established standing.

[5] Throughout this Order, the Court refers to Plaintiffs in the collective with statements such as "Plaintiffs have not demonstrated they have standing." The Court does so for ease of reference. To be clear though,

v. DNC Servs. Corp., 941 F.3d 1116, 1124 (11th Cir. 2019) ("[S]tanding must exist 'for each claim and for each form of relief that is sought.'" (quoting Chester, 581 U.S. at 439) (alterations adopted)). "To establish standing," Plaintiffs "must demonstrate (i) that [one of them has] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the [Defendants], and (iii) that the injury likely would be redressed by the requested judicial relief." Id. at 380 (citing Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)). These three "requirements constitute 'an essential and unchanging part of the case-or-controversy requirement of Article III.'" Id. (quoting Lujan, 504 U.S. at 560). As such, failure to show any one requirement results in a failure to show standing. Koziara v. City of Casselberry, 392 F.3d 1302, 1304 (11th Cir. 2004).

To meet the first requirement, Plaintiffs must suffer an injury-in-fact, that is, "an invasion of a legally protected interest that is both (a) 'concrete and particularized' and (b) 'actual or imminent, not conjectural or hypothetical.'" Lewis v. Governor of Ala., 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (quoting Lujan, 504 U.S. at 560). A "particularized" injury is a harm affecting a plaintiff "in a personal and individual way," not a "generalized grievance" shared by the public. Spokeo, Inc. v. Robins, 578 U.S. 330, 339 & n.7 (2016) (internal quotations omitted). A "concrete" injury is a nonabstract harm of the type "that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." Id. at 340–41. And an "actual or imminent" injury is one that is "certainly impending" rather than "speculative." Clapper v. Amnesty Int'l, 568 U.S. 398, 401 (2013). Additionally, the second element requires that Plaintiffs'

---

as to each of Plaintiffs' arguments and theories of standing, the Court assesses whether any of the Plaintiffs have standing. If the Court found that one of the Plaintiffs had standing, that would be sufficient. Thus, in stating that Plaintiffs do not have standing, the Court holds that each and every Plaintiff does not have standing.

injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (cleaned up) (citation omitted).  To meet the third requirement of standing, Plaintiffs must show that it is "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.  Id. at 561.

Plaintiffs allege that they have: (1) standing to protect voting rights; (2) candidate standing; (3) procedural standing; (4) informational standing; (5) pocketbook standing; and (6) reputational standing.  (Doc. 1, pp. 5–20; doc. 29, pp. 10–16.)  But as to each of these theories, Plaintiffs fail to establish at least one of the three above-listed standing requirements.

## I.    Standing to Protect Voting Rights (Georgia Voters)

Plaintiffs argue that "[b]ecause [Suite 5.5-A] allows unauthorized third parties to alter votes without detection, [Suite 5.5-A] dilutes votes, nullifies the right to vote, and violates Due Process." (Doc. 29, p. 12.)  They contend that the "right to vote is individual and personal in nature," so "Suite 5.5-A's affecting all voters does not convert Plaintiffs' injury into a generalized grievance." (Id. (citing Gill v. Whitford, 585 U.S. 48, 65 (2018); Bonas v. Town of N. Smithfield, 265 F.3d 69, 75 (1st Cir. 2001); Polelle v. Fla. Sec'y of State, 131 F.4th 1201, 1209–10 (11th Cir. 2025); FEC v. Akins, 524 U.S. 11, 25 (1998)).)  Defendants argue that Plaintiffs' "vote dilution" theory "does not support standing here" because "courts resoundingly reject that theory for failure to support a 'particularized' and 'concrete' injury, where, as here, they are suing as voters, and not candidates." (Doc. 35, p. 15.)

As laid out below, Plaintiffs' attempt to satisfy standing on this theory fails both the first (injury in fact) and third (redressability) standing requirements.

**A.      Injury in Fact**

"A citizen may not sue based only on an 'asserted right to have the Government act in accordance with law.'" United Sovereign Ams., Inc. v. Raffensperger, No. 2:24-cv-104, 2025 WL 1266941, at \*4 (S.D. Ga. May 1, 2025) (quoting All. for Hippocratic Med., 602 U.S. at 381).  This is because such claims "amount to little more than attempts to employ a federal court as a forum in which to air generalized grievances about the conduct of government." Valley Forge Christian Coll., 454 U.S. at 483 (internal quotation marks and citation omitted) (alterations adopted). Accordingly, the United States Supreme Court has long rejected standing claims predicated on the right to have the Government act lawfully because such claims fail to assert a particularized and concrete injury. See, e.g., id. (citing Fairchild v. Hughes, 258 U.S. 126, 129 (1922); Baker v. Carr, 369 U.S. 186, 208 (1962); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216–22 (1974); Laird v. Tatum, 408 U.S. 1 (1972); Ex parte Levitt, 302 U.S. 633 (1937)); see also United States v. Hays, 515 U.S. 737, 743 (1995) ("[W]e have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." (citations omitted)).  Additionally, "voters have no judicially enforceable interest in the *outcome* of an election." Jacobson v. Fla. Sec'y of State, 974 F.3d 1236 (11th Cir. 2020) (citing Raines v. Byrd, 521 U.S. 811, 819, 824, 830 (1997)).  "Instead, they have an interest in their ability to vote and in their vote being given the same weight as any other." Id.

For the Plaintiffs "asserting an injury based only on their status as Georgia voters, this case is decided by Wood v. Raffensperger, 981 F.3d 1307, 1314 (11th Cir. 2020)." United Sovereign Ams., Inc., 2025 WL 1266941, at \*4.  In Wood, the plaintiff premised "his standing on his interest in ensuring that only lawful ballots are counted." Id. (alterations adopted).  The Eleventh Circuit Court of Appeals held that this interest was nothing more than an "injury to the right 'to require

that the government be administered according to the law,'" which is a generalized grievance, not a particularized injury. Id. (quoting Chiles v. Thornburgh, 865 F.2d 1197, 1205–06 (11th Cir. 1989)). "And the Supreme Court has made clear that a generalized grievance, 'no matter how sincere,' cannot support standing." Id. (quoting Hollingsworth v. Perry, 570 U.S. 693, 706 (2013)).

Plaintiffs have cited no authority, and the Court is not aware of any, that undermines Wood or that would except their claims from this precedent. To the contrary, the Eleventh Circuit recently applied Wood to uphold the dismissal of claims brought by two Georgia voters who sued the Georgia Secretary of State alleging that the state was violating the National Voter Registration Act's voter list maintenance requirements. See Quinn v. Sec'y of State for Ga., No. 25-11843, 2026 WL 1278727 (11th Cir. May 11, 2026). The court explained, "to the extent [the plaintiffs'] concern reflects a desire that the state count only lawful votes, Wood forecloses that argument as a basis for standing." Id. at *5 (citing Wood, 981 F.3d at 1314). Thus, Plaintiffs cannot transform their request for the government to follow the law into a cognizable basis for standing by arguing that they are suing to ensure election integrity generally. Nor have Plaintiffs shown that their request for the decertification of voting machines is somehow distinguishable from other generalized voter dilution claims that have been rejected for a lack of standing. Framed in this context, Plaintiffs' purported injury is still an "injury to the right to require that the government be administered according to the law." Wood, 981 F.3d at 1314 (internal quotation marks and citation omitted). The alleged injury affects the Plaintiffs as voters indistinguishably from the way it affects all Georgia voters. See United Sovereign Ams., Inc., 2025 WL 1266941, at *5; see also Quinn, 2026 WL 1278727, at *4 ("For [plaintiffs] to state a particularized injury, the injury must be one that does not equally affect all Georgians; the claimed injury here does."). Accordingly,

Plaintiffs have failed to show an injury to satisfy standing requirements for Georgia voters based on their "vote dilution" theory.[6]

### B. Redressability

Even if Plaintiffs could prove an injury based on harms to election integrity or their right to vote, they have not shown that the injury likely would be redressed by the relief that they request. See Lujan, 504 U.S. at 561. For Plaintiffs' putative voting rights injuries to be redressed, Georgia would have to stop using Suite 5.5-A in its elections. But given that neither the State of Georgia nor the Georgia Secretary of State is a party to this lawsuit, Plaintiffs cannot and have not requested that relief. Rather, they ask the Court to enter a final judgment vacating the EAC's certification of Suite 5.5-A and to issue interim relief to delay the effective date of the EAC's certification of Suite 5.5-A to January 21, 2029. (Doc. 1, pp. 41–42; doc. 29, p. 25.) But, as detailed below, even if the Court vacated the EAC's certification of Suite 5.5-A, Georgia law would not obligate Georgia's Secretary of State to stop using Suite 5.5-A in the State's elections. Thus, in essence, Plaintiffs are asking the Court to issue an advisory opinion that Suite 5.5-A should not have been certified so that they can use that opinion to influence others who are not before the Court. The

---

[6] "To be sure, vote dilution can be a basis for standing." Wood, 981 F.3d at 1314.

> But it requires a point of comparison. For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to "irrationally favored" voters from other districts. See Baker, 369 U.S. at 207–08, (1962). By contrast, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally and thus on the proportional effect of every vote." Bognet v. Sec'y Commonwealth of Pa., 980 F.3d 336, 356 (3d Cir. Nov. 13, 2020), vacated as moot sub nom. Bognet v. Degreaffenreid, 141 S. Ct. 2508 (2021). Vote dilution in this context is a "paradigmatic generalized grievance that cannot support standing." Id. (internal quotation marks omitted).

Id. at 1314–15. Plaintiffs allege no point of comparison here. (See docs. 1, 29.)

doors to the federal courthouse do not swing that widely.  All. for Hippocratic Med., 602 U.S. at 378 ("[F]ederal courts do not issue advisory opinions about the law.").

Georgia's voting laws require the Secretary of State to select an EAC-certified voting system that he or she certifies as safe to use in Georgia elections.  O.C.G.A. § 21-2-300(a)(2–3).  The Fulton County litigation described how the Secretary of State and Georgia courts interpret that requirement.  There, the Dekalb GOP challenged Georgia's use of Suite 5.5-A based on the same argument Plaintiffs raise here: that Suite 5.5-A did not meet EAC certification requirements.  The Fulton County Superior Court dismissed the petition, finding that

> [i]n plain language, [O.C.G.A. § 21-2-300(a)] imposes a temporal limitation that only requires EAC certification "prior to [the] purchase, lease, or acquisition" of election equipment.  Similarly, the Secretary's "safe and practicable" certification is a one-time occurrence.  Nothing in this statute indicates the imposition of a continuing duty, and the undersigned finds no ambiguity on this point.

DeKalb Cnty. Republican Party, 2024 WL 4605153, at *3 (quoting O.C.G.A. § 21-2-300(a)(1–3)).  In other words, as the Georgia Court of Appeals put it, the Fulton County Superior Court "determined the plain language of the statute did not impose an ongoing duty on the Secretary related to the certifications required by O.C.G.A. § 21-2-300(a)(2) and (3) . . . ." DeKalb Cnty. Republican Party, 921 S.E.2d at 26.[7]

As to Suite 5.5-A, the Secretary of State complied with O.C.G.A. § 21-2-300(a)'s one-time review requirement in 2019.  At that time, Suite 5.5-A was certified by the EAC.  (See doc. 1, p. 29.)  The Court does not have a DeLorean equipped with a flux capacitor that it can use to travel back to 2019.[8]  Thus, even if this Court could vacate the EAC's certification or declare that Suite

---

[7] The Georgia Court of Appeals did not address whether O.C.G.A. § 21-2-300 imposed an ongoing duty on the Secretary of State because the court determined that the DeKalb GOP did not have standing to seek mandamus relief.  See DeKalb Cnty. Republican Party, 921 S.E.2d at 33 n.17.

[8] Nor can the Court travel forward in time and somehow delay the EAC's certification of Suite 5.5-A to January 21, 2029, as Plaintiffs propose in their request for interim relief.  For one, there is no logical

5.5-A should never have been certified, the Court cannot change history.  The fact would remain that Suite 5.5-A was certified by the EAC when the Georgia Secretary of State reviewed it and determined it was safe for use in the State's elections.  As such, granting Plaintiffs their requested relief would not force the Secretary of State to revisit his determination that Suite 5.5-A was fit for use in Georgia's elections under O.C.G.A. § 21-2-300.

Perhaps sensing the futility of arguing that a ruling in their favor would obligate the Secretary of State to stop using Suite 5.5-A under O.C.G.A. § 21-2-300(a), Plaintiffs point out that the Superior Court did not address O.C.G.A. § 21-2-324(a) in the Fulton County Litigation.  That statute provides, in relevant part, that the "Secretary of State may, at any time, in his or her discretion, reexamine any voting machine."  O.C.G.A. § 21-2-324(a).  But the plain language of this statute does not impose an ongoing duty on the Secretary of State related to the certification of voting machines; it only provides the Secretary with "discretion" to reexamine his determinations.  Id.  Moreover, as a nonparty, the Secretary of State is not "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]."  Jacobson, 974 F.3d at 1254 (quoting Lewis, 944 F.3d at 1302).  The Secretary of State can continue to use Suite 5.5-A as prescribed by Georgia law unless and until he is made a party to a judicial proceeding that determines otherwise.  See id.  As such, Plaintiffs have not proved that declaratory or injunctive relief against the EAC will "significantly increase the likelihood" that the Secretary of State will follow a federal decree that does not bind him.  See id. at 1255.

---

connection between this request and Plaintiffs' claims.  If, as Plaintiffs allege, the EAC should never have certified Suite 5.5-A, the Court could not order that it was certified but just at a later date.  More importantly, even if there was a logical basis for the Court to postdate the EAC's certification, that relief would not change the fact that Suite 5.5-A was certified at the time that the Secretary of State reviewed and purchased Suite 5.5-A in 2019.

Plaintiffs' own declarations reveal that they can only "hope" that a ruling in their favor would cause the Secretary of State to revisit his review of Suite 5.5-A. (See doc. 29-5, p. 3 (Declaration of Richard J. Armstrong) ("If the [EAC] on its own or by order of this Court issues a finding that [Suite 5.5-A] does not meet the [EAC's] certification standards, I would *hope* that the Georgia Secretary of State would use that Office's authority to reexamine its certification that [Suite 5.5-A] is safe for use in Georgia elections.") (emphasis supplied); doc. 29-4, p. 10 (Declaration of Garland Favorito) ("If EAC on its own initiative or on order of this Court finds that DVS Democracy Suite 5.5-A does not meet EAC's certification standards, I would *hope* that the Georgia Secretary of State would use that Office's authority under O.C.G.A. § 21-2-324(a) to reexamine its certification that DVS Democracy Suite 5.5-A is safe for use in Georgia elections.") (emphasis supplied).) Plaintiffs even seem to acknowledge that if the Court ruled in their favor, Georgia would retain discretion over its continued use of Suite 5.5-A. (Doc. 29, p. 18 ("Georgia would be free to determine for itself how to proceed if the EAC certification on which it relied was deficient.").) The Court cannot exercise its limited jurisdiction based on Plaintiffs' "hope" as to what the third-party Secretary of State would do if the Court vacated the EAC's certification of Suite 5.5-A. See Lujan, 504 U.S. at 560 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (internal quotations omitted)).

Plaintiffs also contend that "[e]ither interim or merits relief would afford Plaintiffs a basis to seek mandamus against the Georgia Secretary of State's gross abuse of discretion in failing to reexamine his certification" of Suite 5.5-A "without first petitioning Georgia's Secretary of State." (Doc. 29, p. 6.) But Plaintiffs cannot establish standing by showing that a judgment in their favor would have a "possible, indirect benefit in a future lawsuit." United States v. Juvenile Male, 564 U.S. 932, 937 (2011). Plaintiffs also argue that "[w]here Georgia law independently requires EAC

14

certification, it would be a gross abuse of the Secretary of State's discretion to reexamine [Suite 5.5-A's] safety to continue using [Suite 5.5-A] after EAC vacated its certification." (Id. at p. 13; see doc. 1, p. 19.)  Thus, Plaintiffs are not asking this Court to tell the Secretary of State what he *must do,* but instead to opine on what he *should do*.

> But "[r]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." Franklin v. Massachusetts, 505 U.S. 788, 825, (1992) (Scalia, J., concurring in part and concurring in judgment) (emphasis in original) . . . .  Otherwise, redressability would be satisfied whenever a decision might persuade actors who are not before the court—contrary to Article III's strict prohibition on "issuing advisory opinions." Carney v. Adams, 592 U. S. ——, ——, 141 S. Ct. 493, 498, (2020).  It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.

Haaland v. Brackeen, 599 U.S. 255, 294 (2023).

To be sure, Plaintiffs are free to petition the State of Georgia to revisit its use of Suite 5.5-A to address their putative voting rights injuries.  But, in this action, they "can *hope* for nothing more than an opinion, so they cannot satisfy Article III." Id. (emphasis supplied).

## II.    Organizational and Associational Standing

"An organization can establish Article III standing either through its members or through its own injury in fact." City of S. Miami v. Governor, 65 F.4th 631, 636-37 (11th Cir. 2023) (cleaned up) (citation omitted).  To establish standing, an organization suing on behalf of its members must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." Summers, 555 U.S. at 498.  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Friends

of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 181 (2000); see also Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1160 (11th Cir. 2008).

Defendants argue that "Plaintiffs fail at the first step as they do not identify any individual member with standing in his own right." (Doc. 35, p. 24.) See United Sovereign Ams., Inc., 2025 WL 1266941, at *6 ("Because the Court holds that none of the individual Petitioners would have standing to sue in their own right, United Sovereign Americans cannot satisfy the Article III injury-in-fact requirement either."). VoterGA identifies Plaintiff Armstrong as a member, but, as discussed in Discussion Subsection I.A, supra, Plaintiffs Armstrong and Favorito lack standing in their own right as Georgia voters who are not specifically disadvantaged. Chatham GOP was not a party to the Petition to Vacate at the time it was filed and does not identify any members in the Complaint. (See generally doc. 1.) Chatham GOP identifies Brittany Brown as Chair in Plaintiffs' Emergency Motion for Leave to File Supplemental Declarations, (doc. 47; see doc. 47-3), however Brown lacks standing in her own right. See Discussion Subsection I.A, supra. DeKalb GOP does not identify any members in the Complaint, (see generally doc. 1), and identifies Kendra M. Foltz Biegalski as Chair in Plaintiffs' Emergency Motion for Leave to File Supplemental Declarations, (doc. 47; see doc. 47-2), but Biegalski lacks standing in her own right. See Discussion Subsection I.A, supra.

Plaintiffs concede that the Eleventh Circuit has not recognized any distinct interest of political parties in election integrity for standing purposes. (Doc. 29, p. 14.) Plaintiffs instead argue that "political parties' standing need not be resolved here because the parties have candidate members . . . and candidates have standing to ensure election integrity." (Id.) Defendants agree that candidates for political office have standing. (Doc. 35, p. 20.) The Supreme Court recently explained in Bost v. Ill. State Bd. of Elections, that:

16

> a candidate has a personal stake in the rules that govern the counting of votes in his election. . . . . Win or lose, candidates suffer when the process departs from the law. . . . Such harm to candidates is in no sense "common to all members of the public." . . . What matters is that the harm candidates suffer is distinct from that suffered by the "people generally." Those who spend untold time and resources seeking to claim the right to voice the will of the people have "an undeniably different—and more particularized—interest" in knowing what that will is.

607 U.S. ——, 146 S. Ct. 513, 519–20 (2026). The Court held that a candidate had standing to challenge Illinois's rules requiring the counting of mail-in ballots received after election day, precisely because of his candidacy in that election. Id. at 518, 523. Notably the Court limited its holding to just that: "we address today only candidates' standing to challenge rules that, like Illinois's, govern the counting of votes in their elections." Id. at 524 n.7.

Plaintiffs fail to identify candidate members to establish standing. Chatham GOP and DeKalb GOP did not identify any candidate members in the original pleadings. (See doc. 1.) Plaintiffs moved to file supplemental declarations "with respect to the entity plaintiffs' candidate members." (Doc. 47, p. 1.) Plaintiffs provided declarations of the Chairs of Chatham GOP and DeKalb GOP in which the chairs testify that "their county parties have a history in past elections of having candidate members, presently have candidate members for the 2026 election cycle, and—with respect to DeKalb GOP—very likely will have candidate members in future election cycles." (Id.; see docs. 47-2 & 47-3). Yet these supplemental declarations may not cure defects in standing with after-arising facts. MSP Recovery Claims v. QBE Holdings, Inc., 965 F.3d 1210, 1219 (11th Cir. 2020). Plaintiffs concede that the Eleventh Circuit has been clear that "[a plaintiff] must possess the [asserted] right on the day it filed the complaint," and that "[t]his requirement cannot be met retroactively." (Doc. 47, p. 2 (quoting MSP Recovery Claims, 965 F.3d at 1219).) Thus, "DeKalb GOP and Chatham GOP presumably must have possessed the right to sue on behalf of candidate members on December 22, 2025, in order for DeKalb GOP and Chatham GOP

17

unambiguously to have the right to assert standing uniquely based on their candidate members under Bost." (Id. at p. 3.)

Neither DeKalb GOP nor Chatham GOP have made specific allegations establishing that, at the time of filling, at least one identified candidate member has suffered or will suffer harm. (See generally docs 1, 29, 47, 47-2 & 47-3.) See Summers, 555 U.S. at 498; Ala. State Conf. of the NAACP v. Allen, 796 F. Supp. 3d 759, 887 (N.D. Ala. 2025) ("An organization asserting associational standing must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" (quoting Ga. Republican Party v. Sec. & Exch. Comm'n, 888 F.3d 1198, 1203 (11th Cir. 2018))), appeal filed, No. 25-13007 (11th Cir. Sep. 2, 2025). In their supplemental declarations, both Brown and Biegalski state that their county parties have historically had members who have run as candidates in past elections, yet they do not clearly allege that these members have suffered or will suffer harm. (Doc. 47-2, pp. 2–5; doc. 47-3, p. 2.) They also state that their county parties presently have candidate members for the 2026 election cycle who registered during the March 2–6, 2026, window, yet, as discussed, such after-arising facts cannot cure defects in standing. Additionally, Biegalski's January 2026 declaration does not salvage associational standing by referring to another member of DeKalb GOP, "Darius Francis, who plans to run for Georgia House District 115 in the 2026 election when candidate qualification begins in March of 2026." (Doc. 29-3, p. 7.) Stating that someone "plans to run for Georgia House District 115 in the 2026 election," (id.), does not, without more, supply standing. See Allen, 796 F. Supp. 3d at 887. Similarly, Biegalski's supplemental declaration, stating that current member candidates "expressed their interest to run" before December 22, 2025, and that "DeKalb GOP had a least three members who already planned to run for electoral office as candidates," (doc. 47-2, p. 4), is not sufficient to supply standing. See Allen, 796 F. Supp. 3d at 887.

18

Plaintiffs also argue that, "even though the DeKalb GOP and Chatham GOP members could not formally register their 2026 candidacies until March 2–6, 2026, their injuries as candidates from the use of DVS Democracy Suite 5.5-A in the upcoming 2026 election cycle already were imminent by December 22, 2025," and they conclude that, "[f]or both the ongoing injury from past elections and the imminent injury from future elections, DeKalb GOP's and Chatham GOP's candidate members meet Article III's requirements for a justiciable case or controversy, and DeKalb GOP and Chatham GOP can thus assert Bost here on their members' behalf." (Doc. 47, pp. 5–6.)

Plaintiffs fail to establish both ongoing injury from past elections and imminent injury from future elections. Plaintiffs claim that their "showing on standing is bolstered by flaws in past elections and by the multiple actors who can impair their votes." (Doc. 29, p. 15.) Yet, the Supreme Court made clear that past occurrences of unlawful conduct do not establish standing to enjoin the threat of future unlawful conduct. See City of S. Miami, 65 F.4th at 637 (emphasis added) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)); Lyons, 461 U.S. at 102 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if . . . unaccompanied by any continuing, present adverse effect.").

Further, Plaintiffs only allege "possible future injury" of cybersecurity vulnerabilities in elections rather than "certainly impending" injury. Clapper, 568 U.S. at 409. In her January 2026 declaration, Biegalski stated that "if Georgia continues to use [Suite 5.5-A ] in elections, in [her] individual capacity as a Georgia voter, [she is] concerned both that Georgia will not accurately count [her] vote and that third parties may dilute [her] vote with unlawful votes." (Doc. 29-3, p. 4.) Biegalski further stated that, in her capacity with DeKalb GOP, "members and nonmembers of DeKalb GOP have frequently expressed similar concerns that Georgia's election system will

not accurately count their vote and that malicious actors will exploit the cybersecurity vulnerabilities in Georgia's election system to dilute their vote with unlawful votes." (Id.)  In their December 2025 declarations, Favorito and Armstrong both stated that "[i]f Georgia continues to use . . . Suite 5.5-A in elections, [they are] concerned not only that Georgia will not accurately count [their] vote[s], but also that third parties may dilute [their] vote[s] with unlawful votes." (Doc. 29-4, pp. 11; doc. 29-5, pp. 2–3.)  The declarations are rife with assertions about "possible future injury," rather than supporting injuries that are "certainly impending." Clapper, 568 U.S. at 409.  "Of course, a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.  But mere potential is not enough—if an attenuated chain of inferences is necessary to find [the risk of potential future] harm, speculation will not support forward-looking relief." United States v. City of Tampa, Fla., 739 F. Supp. 3d 1055, 1061–62 (M.D. Fla. 2024) (internal quotations and citations omitted).

Even assuming Plaintiffs have sufficiently established proper candidate members, Plaintiffs still fail to show candidate standing because Plaintiffs are not challenging rules that govern the counting of votes in their elections. See Bost, 2026 WL 96707, at *5 n.7 ("[W]e address today only candidates' standing to challenge rules that, like Illinois's, govern the counting of votes in their elections.").  Plaintiffs are specifically challenging the certification of Suite 5.5-A, which is *not* a challenge to the "rules that govern the counting of votes" as described in Bost.  As Defendants argue, the Bost "decision therefore does not change the result in this case, because Plaintiffs are not candidates "challeng[ing] the rules that govern the counting of votes." (Doc. 35, p. 20.)  For these reasons, Plaintiffs cannot establish Article III standing through candidate standing.

Even if Plaintiffs could demonstrate a concrete injury to candidate members, they cannot establish redressability. Like the putative voting rights injuries discussed in Discussion Section I, supra, Plaintiffs' associational injuries could only be redressed by the State of Georgia not using Suite 5.5-A in the State's elections. But, as discussed in Discussion Subsection I.B, supra, if the Court granted Plaintiffs the relief they request, Georgia would still be free to use Suite 5.5-A. Vacating the EAC's certification of Suite 5.5-A would not require the Georgia Secretary of State to reexamine his determination of Suite 5.5-A's fitness for use. As a nonparty, the Secretary of State is not "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]." Jacobson, 974 F.3d at 1254 (quoting Lewis, 944 F.3d at 1302). The Secretary of State could continue to use Suite 5.5-A as prescribed by Georgia law unless and until he is made a party to a judicial proceeding that determines otherwise. See id. Consequently, Plaintiffs have not proved that declaratory or injunctive relief against the EAC will "significantly increase the likelihood" that the Secretary of State would take any action in response to a federal decree that does not bind him. See id. at 1255.

## III.    Procedural Standing

"To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." Lowman v. FAA, 83 F.4th 1345, 1355 (11th Cir. 2023); see also Lujan, 504 U.S. at 573 n.8 ("We do *not* hold that an individual cannot enforce procedural rights; he assuredly can, so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing."). A litigant "who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for

redressability and immediacy." Lujan, 504 U.S. at 572 & n.7. "Rather, in this situation, the individual has standing 'if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" Lowman, 83 F.4th at 1355 (quoting Cahaba Riverkeeper v. U.S. Env't Prot. Agency, 938 F.3d 1157, 1162 (11th Cir. 2019)); see also id. at 1356 ("[R]edressability is simplified because this Court has the power to order the agency to comply if we determine that the FAA has failed to adhere to NEPA's requirements.").

The parties' arguments as to whether Plaintiffs suffered a procedural injury in fact are scant. (See doc. 29, p. 15; doc. 35, p. 19; doc. 38, pp. 12–13.) Plaintiffs claimed that the EAC unlawfully denied Plaintiffs an administrative procedure that the APA entitles them to. (Doc. 29, p. 15.) Plaintiffs also argued that, "[i]n relying on HAVA § 231(a)(1) [at 52 U.S.C. § 20971(a)(1)] and the VSTC Manual to deny Plaintiffs' right to petition EAC's Executive Director and its Commissioners, Defendants violated Plaintiffs' right of petition." (Id. at p. 17 (citing 5 U.S.C. § 555(b); U.S. CONST. amend. I).) They claimed that that denial "inflicted procedural injury," which—combined with Plaintiffs' concrete injuries—lowers the Article III threshold for immediacy and redressability, and provides standing for a "do-over under the proper procedures and standards, even if the remedy might produce the same result." (Id. at p. 15.) In Response, Defendants argued that Plaintiffs failed to show how they have been subject to a procedural injury. (See doc. 35, p. 19 ("'This is not a procedural rights case' in the first place." (quoting United Sovereign Ams., 2025 WL 1266941, at *4 n.8)).) Defendants contended that Plaintiffs had not shown that the EAC violated procedural rules, that those rules protect Plaintiffs' concrete interests, or that it is reasonably probable that the challenged action will threaten these concrete interests. (Id. (citing Lowman, 83 F.4th at 1355).). Plaintiffs replied that, "[b]y denying Plaintiffs the APA's

procedural petition rights in reliance on EAC's Manual, Defendants violate not only Plaintiffs' APA procedural rights but also Plaintiffs' First Amendment right of petition." (Doc. 38, p. 13.)

Plaintiffs' procedural standing arguments appear to grow out of the EAC's November 18, 2025, response to Plaintiffs' administrative petition. (See doc. 1, pp. 35–36.) The EAC notified Plaintiffs that it would conduct a review of Suite 5.5-A pursuant to the VSTC manual rather than granting their requested merits and interim relief with respect to EAC's certification of Suite 5.5-A. But Plaintiffs have not alleged, much less explained, what procedural rule the EAC violated with that response. The most Plaintiffs have offered are vague references to the APA in their Reply. (See doc. 38, p. 13.) In that argument, Plaintiffs refer the Court to Subsection III.B of their Motion. (See id. (citing doc. 29, pp. 21–22).) However, that Subsection did not argue that the EAC violated the APA. (Doc. 29, pp. 21–22.) Quite the contrary, in that Subsection, Plaintiffs argued that HAVA and the VSTC Manual do not provide them with avenues for review and, therefore, Plaintiffs can seek review in federal district court under the APA. (Doc. 29, pp. 21–22.) Thus, Plaintiffs have not explained how the APA applies to the EAC's review of their administrative petition much less how the EAC caused them procedural injury by violating the APA.

Even if Plaintiffs had alleged that Defendants deprived them of a procedural right in denying their administrative petition, they have not shown that deprivation affected their concrete interest. "[A] procedural right *in vacuo* . . . is insufficient to create Article III standing." Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs, 781 F.3d 1271, 1280 (11th Cir. 2015); see also Lujan, 504 U.S. at 573 n.8. As explained in Discussion Subsection I.B, supra, the State of Georgia's use of Suite 5.5-A in elections is not tied to whether the EAC certification is

vacated.  Thus, Georgia's continued use of Suite 5.5-A is not traceable to the alleged errors in the EAC's review of Plaintiffs' administrative petition.

Furthermore, even if Plaintiffs had demonstrated a violation of a procedural right that protected their concrete interests, they cannot meet the more relaxed standard for redressability applicable in procedural rights cases.  That standard asks whether "there is some possibility that the requested relief will prompt" the EAC to reconsider the decision that allegedly harmed Plaintiffs.  Lowman, 83 F.4th at 1355; see also Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs, 100 F.4th 1349, 1356 (11th Cir. 2024).  In essence, in procedural standing cases, courts remedy the violation of the plaintiffs' procedural right by ordering a "do over" of the administrative process free from the procedural violation.  See, e.g., Ctr. for a Sustainable Coast, 100 F.4th at1356 ("To be sure, it is possible that the [defendant] could complete the additional [administrative] review that the [plaintiff] seeks and still [rule against plaintiff].")  But here, Plaintiffs do not request that relief or any relief as to their 2025 administrative petition.  (See doc. 1, pp. 41–42.)  Instead, they ask the Court to vacate the EAC's 2019 certification of Suite 5.5-A. This relief would not reinstate Plaintiffs' administrative petition free from the putative procedural violation; it would moot it.

## IV.    Informational Standing

For an informational injury, "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." Akins, 524 U.S. at 21 (citation omitted).  "That, the Supreme Court has already made clear, is not a 'bare' procedural violation, or one that is 'divorced from any concrete harm'; if a statute protects against a lack of information, the denial of access to information is a concrete injury."  Muransky v. Godiva Chocolatier, Inc., 979 F.3d 917, 930 (11th Cir. 2020).

Plaintiffs argue that "EAC's denial of Plaintiffs' administrative petition deprived Plaintiffs of the informational rights that 5 U.S.C. § 555(b) and 555(e) afford the public." (Doc. 29, p. 6.) Specifically, Plaintiffs allege that, "[u]nder both HAVA and the APA, Plaintiffs were entitled to EAC's information that [Suite 5.5-A] does not meet EAC's certifications requirements, and Defendants' denial of Plaintiffs' administrative petition denied Plaintiffs that information . . . ." (Doc. 1, pp. 10–11.) The Biegalski and Favorito declarations both refer to "the information that 52 U.S.C. § 20922(2) requires EAC to provide." (Doc. 29-3, pp. 5–6; doc.29-4, p. 9). But, as Defendants note, Plaintiffs provide no basis to conclude that this statute imposes any disclosure requirement that could be the source of any injury here. (See doc. 35, p. 21.) 52 U.S.C. § 20922(2) does not require the disclosure of information, the denial of which would cause a harm that Congress sought to prevent by requiring disclosures.[9] As Plaintiffs acknowledge, the EAC responded to Plaintiffs' Petition to Vacate, (doc. 29-2, pp. 765–67), and provided "a brief statement of the grounds for denial" as 5 U.S.C. § 555(e) requires. At its core, Plaintiffs' informational injury argument takes issue with the substance of the EAC's conclusions, not whether they were given those conclusions. Plaintiffs cannot create an informational injury simply through their disagreement with the information they were given. Plaintiffs have thus failed to show that Defendants failed to provide them information which must publicly be disclosed pursuant to a statute. See Akins, 524 U.S. at 21.

Even if Plaintiffs could prove an informational injury, they have failed to show that the relief they seek in this action would redress that injury. The relief that Plaintiffs seek is not an

---

[9] 52 U.S.C. § 20922(2) provides that the EAC "shall serve as a national clearinghouse and resource for the compilation of information and review of procedures with respect to the administration of Federal elections by . . . carrying out the duties described in part B of this subchapter (relating to the testing, certification, decertification, and recertification of voting system hardware and software)[.]"

order compelling Defendants to provide information that the EAC failed to provide.  (See doc. 1, pp. 41–42.)  Indeed, as stated in Discussion Section III, supra, Plaintiffs do not request any relief as to their 2025 administrative petition.  Instead, they are asking the Court to overturn the EAC's 2019 certification of Suite 5.5-A and to declare that the EAC should not have certified Suite 5.5-A.  (See id.)  In other words, Plaintiffs are not asking the Court to order Defendants to provide them information in Defendants' possession.  They are requesting that the Court issue an order disagreeing with and vacating the information in Defendants' possession.[10]  That relief bears no logical connection to Plaintiffs' putative informational injury.

## V.    Pocketbook Standing

"If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."  TransUnion, 594 U.S. at 425.  Additionally, a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial.  City of Tampa, 739 F. Supp. 3d at 1061–62.  "But mere potential is not enough—if an attenuated chain of inferences is necessary to find [the risk of potential future] harm, speculation will not support forward-looking relief."  Id.

Plaintiffs argue that they have shown "a classic pocketbook injury sufficient to give [the entity plaintiffs] standing."  (Doc. 29, p. 13 (quoting Tyler v. Hennepin Cnty., 598 U.S. 631, 636 (2023)).)  To be clear, Plaintiffs do not seek any monetary relief in this case.  But they claim that

---

[10]  Plaintiffs also claim that if the EAC resolved their administrative petition in their favor, this "would be useful" to their efforts to have the Georgia Secretary State stop using Suite 5.5-A in Georgia's elections. (Doc. 1, p. 10; see also, doc. 29, p. 13.)  To the extent that Plaintiffs seek to bootstrap their informational injury argument with their claim that they will be injured by Georgia's continued use of Suite 5.5-A, that argument fails for the reasons discussed in Discussion Subsection I.B, supra.  Even if the EAC found in favor of Plaintiffs on their administrative petition, that would not cause Georgia to stop using Suite 5.5-A in its elections.

"the relief requested would save the entity plaintiffs money" in two ways: (1) "eliminate the need for VoterGA to pay $250 to support an administrative petition to Georgia['s] Secretary of State under O.C.G.A § 21-2-324(a)," and (2) "the two political party plaintiffs would save money that they otherwise would spend in their election efforts." (Doc. 29, p. 13.)

As for the $250 administrative petition fee, Plaintiffs claim, "[i]f this litigation against EAC is unsuccessful, plaintiff VoterGA has arranged for 10 or more Georgia voters to administratively petition the Georgia Secretary of State to reexamine [Suite 5.5-A's] safety for a cost of $250." (Doc. 29, p. 6.) Even if Plaintiffs could show that this fee was a concrete injury that was causally connected to the EAC's certification of Suite 5.5-A, they cannot show that success in this lawsuit would prevent them from paying that fee. Once again, as laid out in Discussion Subsection I.B, supra, even if the Court vacated Suite 5.5-A's certification as Plaintiffs request, that would not cause the Georgia Secretary of State to stop using Suite 5.5-A in the State's elections. Indeed, Plaintiffs repeatedly argue that if the EAC or the Court were to vacate the certification of Suite 5.5-A, that would then be "useful" to their efforts to have the Secretary of State reexamine his determination of Suite 5.5-A's safety. (See, e.g., doc. 1, p. 10; doc. 29, p. 13; doc. 38, pp. 6, 8.) Thus, under Plaintiffs' own arguments, the relief they request here would not redress their payment of the $250 administrative petition fee.

As for Plaintiffs' argument that success in this lawsuit would save them money that they would otherwise spend on election efforts, resource diversion can constitute a concrete injury. However, Plaintiffs cannot rely on hypothetical cost-savings that are speculative, not concrete. See Bost, 2026 WL 96707, at *16 (Jackson, J., dissenting) ("[The majority] rightly acknowledges that a plaintiff who relies on costs to establish standing must incur those costs to mitigate or avoid a substantial risk of some independent harm." (internal quotations and citations omitted)). Also,

27

they "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."  Clapper, 568 U.S. at 402; see All. for Hippocratic Med., 602 U.S. at 394 (an organization "cannot spend its way into standing").  Plaintiffs rely on the Biegalski and Favorito declarations for the proposition that the "perception that election results can be manipulated through [Suite 5.5-A's] cybersecurity flaws makes it more expensive and more difficult for the entity Plaintiffs to get voters to vote."  (Doc. 29, p. 6 (citing doc. 29-3, pp. 6–7; doc. 29-4, p. 10).)  But these conclusory statements do not explain what resources Plaintiffs would expend.  Nor do Plaintiffs explain what activities, other than "election efforts," the political party Plaintiffs would divert resources away from to pursue an administrative petition.  Cf. Browning, 522 F.3d at 1166 ("These resources would otherwise be spent on registration drives and election-day education and monitoring."); Common Cause/Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009) (explaining that resources would be diverted "from 'getting voters to the polls' to helping them obtain acceptable photo identification" (alteration adopted)); Ga. Latino All. for Human Rights v. Governor of Ga., 691 F.3d 1250, 1260 (11th Cir. 2012) (observing that an immigration organization "cancelled citizenship classes to focus on" increased inquiries about a new law).  Additionally, Plaintiffs "cannot rely on a self-imposed injury to satisfy Article III" standing. Nelson v. Experian Info. Sols. Inc., 144 F.4th 1350, 1354 (11th Cir. 2025); see also Tsao v. Captiva MVP Rest. Partners, LLC, 986 F.3d 1332, 1345 (11th Cir. 2021) (a plaintiff "cannot conjure standing here by inflicting injuries on himself to avoid an insubstantial, non-imminent risk" of harm).

Even if Plaintiffs established that the EAC's certification of Suite 5.5-A caused them to suffer a "pocketbook" injury, in the form of additional resources spent on election efforts, this theory of standing fails to meet the redressability element.  Once again, the Court refers to its

determination in Discussion Subsection I.B, supra, that vacatur of the EAC's certification of Suite 5.5-A would not obligate or likely cause the Georgia Secretary of State to stop using Suite 5.5-A in the state's elections.  Thus, success in this lawsuit would not remedy the "perception that election results can be manipulated through [Suite 5.5-A's] cybersecurity flaws" which Plaintiffs cite as the source of their pocketbook injury.  (Doc. 29, p. 6 (citing doc. 29-3, pp. 6–7; doc. 29-4, p. 10).)  Consequently, Plaintiffs have failed to logically explain how the relief they request here would eliminate the pocketbook injuries they claim give them standing.[11]

## VI.    Reputational Standing

Plaintiffs argue that they "suffer reputational harm from inaccurate criticism of their challenge to the safety of [Suite 5.5-A] and similar election systems."  (Doc. 29, p. 14.) Specifically, Plaintiffs allege that their "concerns about [Suite 5.5-A's] unsecure nature are derided in the legacy media." (Doc. 1, p. 11.)  Plaintiffs analogize their questioning of Suite 5.5-A's safety to the questioning of the 2020 election, which they contend "major media outlets malign as misinformation and disinformation." (Doc. 29, p. 14.)  Plaintiffs claim that a judgment compelling the EAC to vacate Suite 5.5-A's certification "would prospectively prevent further reputational harm to Plaintiffs, which is a cognizable Article III form of injury."  (Id. (citing TransUnion, 549 U.S. at 417).)  Plaintiffs further argue that "because the premise underlying the reputational attacks on Plaintiffs is EAC's imprimatur over" Suite 5.5-A's safety, their risk of future and continuing reputational harm "is traceable not only generally to EAC but also specifically to EAC's failure to correct its mistake in certifying" Suite 5.5-A.  (Id.)

---

[11]  If anything, it seems a judicial determination that Suite 5.5-A should not have been certified by the EAC would only make it more expensive for the political party Plaintiffs to get voters to participate in elections using Suite 5.5-A.

In some cases, the risk of reputational harm can be sufficient to establish standing to litigate claims on the merits. Meese v. Keene, 481 U.S. 465, 479 n.14 (1987). But Plaintiffs must "show that [D]efendants caused [their] reputational injury and that this Court can redress it by granting the relief [they] request[]." Rangel v. Boehner, 20 F. Supp. 3d. 148, 160 (D.D.C. 2013), aff'd, 785 F.3d 19 (D.C. Cir. 2015). "[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (internal quotations omitted).

Even assuming Plaintiffs could establish an injury-in-fact through the harm that they suffer when third parties malign their criticism of Suite 5.5-A, their attempt to connect that harm to Defendants is far too attenuated. Again, under the causation prong of standing, Plaintiffs' injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan, 504 U.S. at 560 (cleaned up) (citation omitted). Here, Plaintiffs' claimed reputational injury did not flow from the EAC's certification of Suite 5.5-A. Rather, it was caused by third parties' criticisms of Plaintiffs' criticism of that certification. Given that Plaintiffs' injuries are traceable to the actions of third parties not before the Court, Plaintiffs cannot establish this essential element of standing. See Clapper, 568 U.S. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."); Allen v. Wright, 468 U.S. 737, 759 (1984) ("The links in the chain of causation between the challenged . . . conduct and the asserted injury are far too weak for the chain as a whole to sustain [plaintiffs'] standing.").[12]

---

[12] Allowing a plaintiff to establish standing to sue a government agency simply by showing that others disagreed with or maligned the plaintiff's criticism of the government agency, would render Article III's

30

Even if Plaintiffs' alleged reputational injuries were traceable to the EAC, Plaintiffs cannot prove that the injuries are redressable by the Court. As Defendants argue, "[a]ny notion that the sought injunction against EAC certification would put an end to this alleged disparagement by these third parties is purely conjecture." (Doc. 35, p. 13.) Again, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560 (internal quotations omitted). The Court cannot control the actions of third-party media outlets. Favorito's declaration states that "vacating EAC's certification of . . . Suite 5.5-A would be useful both to me personally and to VoterGA in defending our reputations . . . ." (Doc. 29-4, p. 9.) But Plaintiffs cannot invoke this Court's jurisdiction simply because the Court's assessment of Plaintiffs' views of Suite 5.5-A "might persuade actors who are not before the court" to agree with Plaintiffs. Haaland, 599 U.S. at 294.

## CONCLUSION

For these reasons, Plaintiffs have failed to establish standing. Accordingly, the Court **DISMISSES** Plaintiffs' Complaint for lack of subject matter jurisdiction. The Court **DIRECTS** the Clerk of Court to enter appropriate judgment of dismissal and to **CLOSE** this case.

**SO ORDERED**, this 12th day of May, 2026.

R. STAN BAKER, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

limitations meaningless. Particularly in an age of robust public debate over government action, a standing threshold this permissive could turn nearly every social media post into a federal lawsuit.